CITIZENS UTILITY BOARD *et al.*, Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

First District (5th Division) Nos. 1—94—2270, 1—94—2307 cons.

Opinion filed November 9, 1995.

Wanda K. Zatopa, of Chicago, for petitioner Citizens Utility Board.

Janice A. Dale and Eve Moran, Assistant Attorneys General, of Chicago, for petitioner People *ex rel.* Roland Burris.

David L. Nixon, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

Duane A. Feurer, David S. Guin, and Elizabeth M. Bradshaw, all of Ross & Hardies, of Chicago, for respondent Central Telephone Company of Illinois.

Paul N. Keller, of Park Ridge (David R. Wiltse, of Des Plaines, Jeffrey M. Randall, of Glenview, and Everette M. Hill, Jr., of Mt. Prospect, of counsel), for *amici curiae.*

JUSTICE McNULTY delivered the opinion of the court:

The Illinois Commerce Commission (the Commission) granted Central Telephone Company of Illinois (Centel) permission to restructure its rates and to increase its total revenues. In this appeal the Attorney General, on behalf of the People of the State of Illinois (the AG), and the Citizens Utility Board (CUB) raise several issues concerning the fundamental role of the Commission. We reverse the Commission's order and remand for further proceedings because the Commission neglected its duty to consider the interests of consumers when setting rates, and therefore its findings did not support the rate restructure it ordered.

In 1993 Centel, a wholly owned subsidiary of Centel Corporation, filed with the Commission revised tariff sheets which reflected a restructuring of rates, so that customers would pay a flat rate for connection to the telephone network plus a charge per call depending on the duration of the call. For Chicago area customers, the charge per call also depended on the time of day of the call and the distance between switching stations used in completing the call. Centel referred to the connection charge as its "network access line" charge or "NAL." The proposed tariffs eliminated a number of calling plans previously available, which permitted unlimited calling in certain areas for a flat fee. The proposed tariffs replaced the plans with the usage sensitive service (USS) that added a charge for each call.

Also in 1993 Centel Corporation merged with Sprint Corporation, and Centel became a subsidiary of Sprint. As a result of the merger Sprint eliminated a number of employment positions in Centel and Centel Corporation by consolidating operations. Centel offered its employees severance packages as part of its plan for reducing its work force. Centel designed the proposed rates to increase total revenues by $10.2 million annually, based on revenues and costs for the test year of 1992, with adjustments for known changes largely due to the merger.

The Commission suspended the revised tariffs, and hearing examiners took evidence concerning the proposed rates. The hearing examiners permitted intervention by a number of parties, including the AG and CUB. The Commission adopted most of the hearing examiners' findings, including approval of rate restructuring. Staff of the Commission proposed to adjust rates by eliminating the touch tone rate and the premium included in the business rate for custom calling and directory listings, and by reducing rates for business lines. The Commission ordered Centel to file new tariff sheets conforming to the staff's proposal, to produce an increase in revenues of $6.3 million annually, rather than the $10.2 million Centel sought.

■ CUB and the AG contend that the Commission failed to establish Centel's rates, failed to consider the impact of the proposed rates on Centel customers, failed to make findings necessary for judicial review, and made a number of findings which are contrary to the manifest weight of the evidence. Our supreme court has frequently reiterated the principles governing review of Commission orders in rate cases:

> "Setting utility rates is a legislative rather than a judicial function. [Citations.] In the ratemaking scheme, the Commission and not the court is the fact-finding body. [Citation.] Apart from examining whether the Commission acted within the scope of its

authority or infringed upon a constitutional right, a court is limited to reviewing whether the Commission set out findings of fact supporting its decision and whether the findings are against the manifest weight of the evidence." (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142, 510 N.E.2d 865.) This court lacks authority to "delve into the record and make a finding of fact in order to support a ruling of the [C]ommission." (*Peoples Fruit & Vegetable Shippers Association v. Commerce Comm'n ex rel. Illinois Central R.R. Co.* (1933), 351 Ill. 329, 333, 184 N.E. 615.) If the Commission's order does not include sufficient findings of fact, "the order is void." *Peoples Fruit*, 351 Ill. at 332.

I

■ The Public Utilities Act (the Act) (220 ILCS 5/1—101 *et seq.* (West 1992)) provides:

"If the Commission enters upon a hearing concerning the propriety of any proposed rate *** the Commission shall establish the rates or other charges *** which it shall find to be just and reasonable." (220 ILCS 5/9—201(c) (West 1992).)

Petitioners claim that the Commission violated this statute and improperly delegated authority by failing to impose directly new rates, when the Commission instead ordered Centel to file new tariffs to meet the specifications of the order.

■ While the Commission's resolution of legal questions does not bind the court, courts give

"substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with its administration and enforcement. [Citation.] The reason for this deference is that agencies can make informed judgments about the issues based on their experience, and they constitute an informed source for ascertaining the legislative intent. [Citation.] In construing a statute or regulation, an agency can take administrative notice of its own findings and orders." *Moncada v. Illinois Commerce Comm'n* (1991), 212 Ill. App. 3d 1046, 1052-53, 571 N.E.2d 1004.

The Commission noted that it has in other cases ordered utilities to file tariffs in accord with its directions. Under the Commission's interpretation of the statute, as long as the Commission has established constraints which eliminate discretion, leaving the utility only to perform the necessary calculations, the Commission has not improperly delegated its ratemaking authority. We find the Commission's interpretation of the Act persuasive. See *Citizens Utility Board ex rel. O'Malley v. Illinois Commerce Comm'n* (1995), 275 Ill. App. 3d 329.

■ Here the Commission established the exact total of the revenues allowed, and it directed Centel to revise its tariffs to eliminate the touch tone premium, and the business premium on specified charges, and instructed Centel to reduce the charges for business access lines to a level at which Centel's expected total revenue would equal the revenue the Commission permitted. By not ordering any reduction in other rates, the Commission approved the other rates as filed. We find that the Commission's order effectively eliminates discretion and therefore it comports with the mandate of section 9—201(c), which directs the Commission to establish rates.

## II

■ The legislature included in the Act its findings that "universally available and widely affordable telecommunications services are essential to the health, welfare and prosperity of all Illinois citizens" (220 ILCS 5/13—102(a) (West 1992)), and "telecommunications services should be available to all Illinois citizens at just, reasonable and affordable rates" (220 ILCS 5/13—103(a) (West 1992)). Petitioners argue that the Commission violated these parts of the Act by failing to consider the impact of rate restructuring on Centel's customers.

The Commission answers:

> "THE ACT DOES NOT REQUIRE THE COMMISSION TO CONSIDER THE IMPACT OF INCREASED RATES [on consumers]." (Emphasis in original.)

The Commission acknowledges its responsibility for setting "just and reasonable" rates. 220 ILCS 5/9—201(c) (West 1992).

Our supreme court has held:

> "The Commission is charged by the legislature with setting rates which are *just and reasonable* *** to the ratepayers [and] to the utility and its stockholders." (Emphasis in original.) (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 208, 585 N.E.2d 1032 (*BPI*), quoting 220 ILCS 5/9—201(c) (West 1992).)

Our supreme court has quoted the United States Supreme Court, finding that Court's views of agency responsibilities consistent with our court's views of the duties of the Commission:

> " 'The rate making process under the act, *i.e.*, the fixing of "just and reasonable" rates[,] involves a balancing of the investor and the consumer interests.' " (*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 287, 111 N.E.2d 329, quoting *Federal Power Comm'n v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 603, 88 L. Ed. 333, 345, 64 S. Ct. 281, 288.)

Similarly, our supreme court earlier established that a just and reasonable rate must be less than the value of the service to consumers.

(*State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.* (1919), 291 Ill. 209, 216, 125 N.E. 891.) The appellate court elaborated on this pronouncement in *Camelot Utilities, Inc. v. Illinois Commerce Comm'n* (1977), 51 Ill. App. 3d 5, 10, 365 N.E.2d 312:

> "The Commission has the responsibility of balancing the right of the utility's investors to a fair rate of return against the right of the public that it pay no more than the reasonable value of the utility's services. While the rates allowed can never be so low as to be confiscatory, within this outer boundary, if the rightful expectations of the investor are not compatible with those of the consuming public, it is the latter which must prevail."

These decisions comport with authorities from other jurisdictions which hold that "the constitution requires *** that the regulatory body engage in a rational process of balancing consumer and investor interests to produce a rate that is just and reasonable." *In re Public Service Co.* (1988), 130 N.H. 265, 274, 539 A.2d 263, 268.

Thus, the Act requires the Commission to establish rates which are "just and reasonable" for both the investors and the consumers. Although we defer to the Commission in setting rates, our deference "does not mean that the Commission may ignore pertinent factors affecting the rate structure." (*Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n* (1960), 19 Ill. 2d 436, 442, 167 N.E.2d 414.) The Commission cannot fulfil its statutory duty to balance the competing interests of stockholders and ratepayers without taking into account the interests of ratepayers by considering the impact of proposed rates on ratepayers.

In some cases appellate courts have approved rate increases without expressly discussing the expected impact of the increase on consumers. (See, *e.g., Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 303 N.E.2d 364.) When the Commission increases rates uniformly for all consumers, no group of consumers is likely to experience detriment significantly greater than that suffered by other consumers. Evidence concerning the impact on consumers in such cases may not assist the Commission substantially, as that impact does not negate the Commission's responsibility for setting rates that take into consideration the investors' need for a reasonable return on investment.

■ Here, on the other hand, the Commission ordered a complete restructuring of rates, eliminating many flat rate calling plans in favor of rates based more closely on usage. For some consumers the new rates could reduce monthly phone bills while others could have their bills double or triple, with no change in usage, if the customer

usually made a large number of calls under a flat rate plan. The Commission also ordered a shift in rates to reduce the burden on businesses and allocate more costs for recovery from residential consumers. While one stated goal of the Act is allocation of costs to those who cause the costs to be incurred (220 ILCS 5/1—102(d)(iii) (West 1992)), that prefatory language cannot justify the rates here. Proprietary information shows that prices of all calls distantly exceed their long-run service incremental costs (LRSICs); the utility publicly admitted that even with proposed 50% discounts for high volume users, call prices to those users would well exceed LRSICs. The approved prices, therefore, far exceed the level needed for assignment of costs. We hold that before the Commission could order such a pervasive restructuring of rates, it needed to hear evidence which could support a finding that the rates as restructured will impose just and reasonable burdens on all ratepayers. In the absence of evidence concerning the impact of the rate restructuring on consumers, the Commission had no basis for the required findings.

Centel argues that the Commission effectively made the findings needed to support the restructuring, because the Commission found:

> "Centel's USS rate design proposal, as modified, is reasonable. The Company's current rate design is fraught with complexity, cross-subsidies, inequities and inefficiencies. The weight of the evidence demonstrates that Centel's proposed USS rate design eliminates, to a large measure, many of the problems which currently exist."

The Commission said nothing about the effect of the restructuring on consumers, as it heard no evidence on this issue. The Commission effectively concedes that it did not consider consumer interests, as it argues the statute does not require it to consider the effect on consumers. The argument itself shows that the Commission based its order "upon this misapprehension of that principle of law which was binding upon the commission." (*Illinois Central R.R. Co. v. Illinois Commerce Comm'n* (1944), 387 Ill. 256, 287, 56 N.E.2d 432.) The Commission could not meet its duty to "protect[ ] the interests of the ratepayers" (*Citizens for a Better Environment v. Illinois Commerce Comm'n* (1981), 103 Ill. App. 3d 133, 142, 430 N.E.2d 684), without taking into account the varying effect of rate restructuring on consumers.

The Commission's finding that the restructured rates are just and reasonable is not supported by sufficient evidence because the order reports no evidence concerning the effect of restructuring. Where the utility has presented no evidence concerning the impact of rate restructuring on ratepayers, it has not met its burden of proving the

restructuring just and reasonable for those ratepayers. (220 ILCS 5/9—201(c) (West 1992).) Accordingly, we reverse the Commission's order and remand for hearings concerning the impact of restructuring on consumers.

## III

We address only those further issues which are likely to arise on remand.

### A. COMMON CARRIER LINE CHARGE

■ CUB contends that the Commission failed to take into account some revenues and some other uses of the physical plant in setting network access line charges. Centel's equipment carries interstate as well as intrastate calls, and the Federal Communications Commission permits Centel to recover part of its fixed plant costs through a common carrier line charge (CCLC). The Commission found:

> "While the Company did not include the CCLC rate in its analysis, it correctly argues that the impact of including the CCLC rate would be to increase the margin in the NAL rate above the LRSIC. Staff did not object to the Company's proposal and CUB raised no compelling argument against Centel setting the NAL rate above the LRSIC to recover its costs."

Although the Commission has broad discretion in weighing evidence to determine a just rate, it cannot simply ignore or fail to assign a value to resources which generate income. (*Springfield Gas*, 291 Ill. at 231-33.) Here the Commission failed to find the value of the revenues received through the CCLC, and therefore it failed to take that revenue into account in designing rates. While the Commission correctly points out that the CCLC only allows the utility to increase the profit it receives from the NAL, the Commission cannot assess the actual revenues and profits attributable to various uses without evaluating the CCLC revenues.

### B. FACILITY DESIGN AREAS

■ Centel created facility design areas (FDAs) as part of a transition from an all-copper distribution network to a network incorporating fiber optics. Centel allocated all costs of the FDAs to noncompetitive basic local services, although the FDAs will also support competitive high bandwidth services. The Commission found that "all customers, both residential and business, will enjoy the benefit of lower network costs under the FDA design," and therefore the Commission "[did] not find that the costs associated with the FDA design should only be allocated to *** higher bandwidth services." On the

basis of this finding, the Commission accepted Centel's allocation of all FDA costs to basic local services and none to high bandwidth services.

While the finding is supported by evidence, it does not support the decision. (See *Peoples Gas Light & Coke Co. v. Illinois Commerce Comm'n* (1991), 221 Ill. App. 3d 1053, 1060, 583 N.E.2d 68.) The Commission apparently ignored the precept that

> "the costs for a particular service must include not only the specific expenditures, but also a just portion of the expenses incurred for all services of which that in question forms a part." (*Produce Terminal Corp. v. Illinois Commerce Comm'n* (1953), 414 Ill. 582, 593, 112 N.E.2d 141.)

Where competitive and noncompetitive services both utilize physical assets, "it would be arbitrary and *illegal* for the Commission to fail to make *some* apportionment of common overhead to competitive services." (Emphasis in original.) *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1990), 203 Ill. App. 3d 424, 441, 561 N.E.2d 426.

If high bandwidth services benefit from the creation of FDAs, part of the cost of FDAs must be allocated to competitive high bandwidth services and away from basic local services for which Centel faces no competition. Even if CUB requested allocation of all FDA costs to high bandwidth services, that request cannot excuse the Commission's failure to assign a just proportion of the costs to the competitive services. The Commission is not merely an arbitrator between the utility and parties opposing a rate change, it is an investigator and regulator of utilities responsible for the setting of just rates for all affected by the rates. *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 117 Ill. 2d at 135.

## C. GROWTH SPARE

■ Centel's witnesses testified that Centel increases its capacity only in large chunks which leave it with excess capacity or "growth spare" while demand grows to fill the capacity. Centel allocated the cost of the growth spare on the basis of proportions of current usage of all capacity. CUB argued that the Commission should allocate growth spare on the basis of projections for growth in services likely to use the spare. The Commission said:

> "[W]e concur with the Company that it would be virtually impossible to establish what services will experience growth and the extent of such growth."

While CUB points out that the FCC requires allocation based on projected growth in regulated and nonregulated services, FCC rulings do not bind the Commission. (See *Atchison, Topeka & Santa Fe*

*Ry. Co. v. Commerce Comm'n ex rel. Illinois Coal Traffic Bureau* (1929), 335 Ill. 624, 167 N.E. 831.) The Commission properly relied on evidence in the record that Centel could only guess the percentages of growth spare various services will use. Since the Commission has set forth findings which support its decision and the findings are not contrary to the manifest weight of the evidence, we will not disturb its holding concerning growth spare.

### D. DEPRECIATION OF ANALOG EQUIPMENT

In 1987 the Commission allowed Centel to increase the rate at which it recorded depreciation of obsolete electric analog equipment. (Although the Commission order and the parties refer to the expense as "amortization," the expense for which Centel seeks recovery should be considered "depreciation," because it is the cost of physical equipment. (See Black's Law Dictionary 397 (5th ed. 1979).) "Amortization" refers only to costs of intangible assets. (See Black's Law Dictionary 76 (5th ed. 1979)).) The Commission allowed Centel to record depreciation of the equipment at the rate of almost $684,000 per year for 8.25 years, from October 1987 through December 1995. As of the date of the Commission's order in this case, Centel had recorded the expense at the allowed rate for $6^1/2$ years, leaving only 20 months of depreciation remaining. Centel sought to recover $684,000 per year through new rates. The Commission staff and the AG proposed allowing Centel to recover through rates the remaining book value, which was $1,140,000, over five years by including $228,000 as an annual depreciation expense for the equipment.

The Commission found:

> "[T]he equipment in question has been retired from service for several years. ***
>
> *** Due to the Commission's previous establishment of an amortization period, we find no compelling arguments to modify our prior Order. To ensure that the Company is not earning [in] excess of their allowed rate of return, the Commission directs Staff to monitor Centel's earnings."

Depreciation is an expense subject to test-year principles. (*BPI*, 146 Ill. 2d at 239.) By matching test-year depreciation with test-year revenues, the utility charges customers receiving the benefit of plant in use that year for the deterioration in plant during the year. (*BPI*, 146 Ill. 2d at 238-39.) Current ratepayers should pay for only that plant which produces current benefits. *BPI*, 146 Ill. 2d at 239.

Here the analog equipment being depreciated has been out of service for several years, and it produces no benefit for current ratepayers. Apparently because Centel still carried a substantial value on its

books for the equipment when Centel retired it as obsolete, the Commission in 1987 allowed Centel to record accelerated depreciation for the equipment. The order here allows Centel to recover the depreciation for this obsolete equipment annually, until its next rate case, at the accelerated rate.

In *BPI* the Commission allowed Commonwealth Edison a different form of accelerated depreciation. There Edison invested billions in new equipment which went into service during the pendency of the rate case, but some years before the Commission resolved the case and the new rates went into effect. Edison deferred depreciation of the plant pending the resolution of the case and the Commission allowed Edison to include the deferred depreciation in its rate base and in the plant to be depreciated annually. The Commission treated the added plant as though it became operational on the day the new rates became effective, and as though its useful life was shorter than its expected useful life by the duration of the regulatory delay.

Our supreme court reversed the Commission's decision on this issue, holding:

"Edison is correct that, after adjusting for the higher carrying charges, the accounting variance does not increase the aggregate amount of depreciation expense which will be recognized over the course of the plants' useful lives. However, because the entire cost of the plants is amortized over less than the full useful lives of the plants, the variance increases the annual depreciation expense to be recognized in each of the years following the deferral period. For this reason we find that recovery of deferred depreciation violates the test-year principles." *BPI*, 146 Ill. 2d at 240.

The Commission here allowed Centel to recover the depreciation of obsolete equipment through its new rates based primarily on its prior order permitting Centel to record the accelerated depreciation. The court in *BPI* sharply distinguished permission to record costs from permission to recover those same costs through rates. (*BPI*, 146 Ill. 2d at 246.) As the court said:

"A decision to permit recording of deferred charges has only an indirect impact on rates and, therefore, is not subject to the same scrutiny as a decision to raise rates. It is improper to assume, as the Commission did, that having met the criteria for recording deferred charges, Edison is automatically entitled to recovery of the full amount recorded. This is especially true because recovery of deferred charges is a deviation from the normal accounting procedures." *BPI*, 146 Ill. 2d at 246-47.

■ The order regarding recording of costs cannot, by itself, provide an adequate basis for permitting Centel to recover, through increased rates, the cost of equipment which has not been in use for

several years. (See *Illinois Power Co. v. Illinois Commerce Comm'n* (1993), 254 Ill. App. 3d 293, 302, 626 N.E.2d 713.) Because the Commission has not articulated findings which support its order on this issue, it must reconsider its determination on remand. If the Commission permits Centel to recover through current rates any part of the cost of the obsolete equipment, which Centel should have recovered during the equipment's useful life, the Commission must explain why that recovery does not amount to retroactive ratemaking. See *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 206-07, 529 N.E.2d 510.

### E. MERGER COSTS

■ The AG presented evidence and argument concerning various costs related to the merger with Sprint, including severance and outplacement expenses of $2.6 million and services integration costs of $9.2 million. The Commission allowed Centel to recover through rates these and other expenses related to the merger, without addressing either the AG's objections or the evidence supporting the expenditures.

The Commission need not make findings on every issue of fact, but it must state the facts essential to its rulings in a manner that enables this court to intelligently review the decision. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1971), 49 Ill. 2d 458, 463, 275 N.E.2d 417; *Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 369-70, 415 N.E.2d 345.) We find that these contested costs are sufficiently significant, in the context of this case, to warrant explicit factual findings and analysis. (See *BPI*, 146 Ill. 2d at 219-21.) On remand the Commission should make findings sufficient for this court to review the expenses related to the merger.

### IV

CUB argues that the Commission overstated Centel's cost of capital by using Centel's actual capital structure, including excessive equity capital, and by overestimating the cost of equity capital.

### A. CAPITAL STRUCTURE

Witnesses for Centel, the Commission staff, and CUB explained the relationship between capital structure and the cost of capital, and they agreed on most fundamental principles. Corporations acquire capital either by increasing debt (*e.g.*, by selling bonds), or by increasing equity (*e.g.*, by selling stock). Reasonable persons will purchase a corporation's securities only if they expect to receive later their initial investment plus a reasonable return. When they invest,

they understand that they risk the possibility that the corporation may go out of business, and the investors may lose all or part of their investments. As the perceived risk of loss increases, the amount of return investors demand increases. Therefore debt instruments, which the corporation must pay off entirely before its equity investors receive any part of their initial investments, command lower premiums than equity. Similarly, because the risk of financial collapse in the short term is less than the risk over the long term, short-term debt costs less than long-term debt. Also, because debt payments are generally tax deductible while dividend payments are not, debt costs less than equity.

A corporation facing financial difficulties has no legal obligation to pay any amount to equity investors, but it must pay holders of debt instruments promised dividends, and it must pay off the entire value of debt instruments on their redemption dates. Therefore, as the proportion of a corporation's capital financed by debt increases, its fixed costs increase, and its financial stability decreases. A corporation with a higher percentage of debt-financed capital will need to pay more for both its debt and its equity than a corporation with a greater proportion of equity capital, if all other risk factors are equal. However, since equity always costs more than debt, as a corporation increases its proportion of equity, its total cost of capital generally increases, although the cost of debt and the cost of equity both decrease. Theoretically, if one can determine the change in the costs of debt and equity as percentage of equity in the capital structure increases, one can determine a capital structure which minimizes total cost of capital.

The capital structure which minimizes the total cost of capital will depend to some extent on the nature of the business the corporation pursues. In more competitive and less established industries, with lower profit margins and greater fluctuations in revenue, cost of debt may increase to prohibitive levels if the corporation does not maintain a high level of equity capital. In more stable industries, or where the corporation faces less competition, creditors will be willing to loan the corporation money at low interest rates even when it has relatively low levels of equity capital, because the creditors can still be reasonably certain of receiving the promised return.

Regulators have a duty to protect investors in utilities, and therefore those investors have an added level of assurance that investors in industries with otherwise comparable earnings and capital structure lack. Regulators set rates for utilities designed to allow the utilities to recover their operating costs plus a cost of investor capital, using the formula "R (revenue requirement) = C (operating costs) + Ir

(invested capital or rate base times rate of return on capital)." (*Citizens Utilities*, 124 Ill. 2d at 200-01.) By increasing the rate of return on capital, the utility increases its revenue requirement, so the regulators allow an increase in rates that increases the utility's income. When a larger corporation owns a utility, the corporation is generally motivated not to establish an optimal, lowest cost capital structure for the utility, but to use instead a structure with a greater percentage of equity than is optimal, thereby allowing the corporation to realize a greater return. The assured profits from the regulated utility can then bolster the security of the corporation, allowing it to sell its own debt instruments at lower cost and use the debt capital to finance riskier, unregulated and competitive ventures. Thus, the corporation maintains an overall capital structure with a higher proportion of low-cost debt, while reporting the capital structure of the owned utility with a higher proportion of high-cost equity. The Commission acknowledged the evidence showing that corporations which own utilities have this incentive to overstate the effective equity in the capital structures of the utilities, saying: "There is no question that a capital structure may be manipulated."

The legislature has directed the Commission to protect against the increased cost of capital sought by a utility with such an inflated level of equity.

> "In determining a reasonable rate of return upon investment for any public utility in any proceeding to establish rates or charges, the Commission shall not include any incremental risk or increased cost of capital which is the direct or indirect result of the public utility's affiliation with unregulated or nonutility companies." 220 ILCS 5/9—230 (West 1992).

CUB argued that Sprint's consolidated capital statement shows that Centel's capital structure included inflated equity, leading to an unreasonable cost of capital used to support Sprint's less stable, unregulated subsidiaries. Sprint's regulated local telephone company subsidiaries, including Centel, report a total capital structure of 60% equity and 40% debt. This is very close to Centel's reported capital structure of 61.3% equity and 38.7% debt. Sprint itself, including all of its unregulated and highly competitive other subsidiaries, reported in a proprietary exhibit a total capital structure of significantly greater debt and less equity. After subtracting from the total capital structure the reported capital structure of low-risk regulated telephone companies, Sprint's other, high-risk operations have a combined capital structure of far greater debt and very little equity. CUB argues that this shows that Centel is, in effect, using the overstatement of effective equity invested in Centel to subsidize the

higher risk operations, by allowing Sprint to sell Sprint debt instruments to support the risky operations at low cost.

The Commission held:

"[T]he Company's common equity ratio is within one standard deviation of the *** average for telecommunication companies. *** Centel's common equity ratio is substantially similar to the ratio which was approved in its last rate case, and also very similar to the ratio which was approved in the last Illinois Bell rate case. The Commission concludes that the Staff/Centel proposed capital structure is reasonable.

***

*** [T]he Commission cannot legally draw *** a conclusion [that Sprint overstated Centel's effective capital structure] without a preponderance of the evidence supporting such a finding. [Citation.] In this instance, the Commission concludes that the weight of the evidence does not support a finding that Centel's capital structure has been manipulated.

Finally, the Commission concurs with the Staff recommendation to have Centel conduct a study of its capital structure to determine whether the Company can achieve its goals at a lower cost. Therefore, Centel is directed to include in its next rate case filing the study of its capital structure."

■ The utility bears the burden of proving that its proposed rates are just and reasonable. (220 ILCS 5/9—201(c) (West 1992).) To prove this the utility must prove the reasonableness of the values it places on the components of the revenue requirement. Thus, the utility must show that its operating costs are reasonable, its rate base is the reasonable value of its property used for serving the public, and its rate of return on capital is the reasonable cost of the capital needed to provide the services. See *Iowa-Illinois Gas*, 19 Ill. 2d at 445; *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 222-23, 460 N.E.2d 1190.

Thus, the Commission should disallow recovery of any cost of capital in excess of that reasonably necessary for the provision of services. If a utility has included excessive equity in its capital structure, it has inflated the rate of return and its capital cost. While the Commission here found that Centel's reported capital structure was reasonable, it also ordered Centel to perform studies to determine whether a different capital structure could reduce capital costs. As Centel conceded at oral argument, the order shows that the Commission found a reasonable likelihood that a different capital structure would permit Centel to meet its capital needs at lower cost. But this means Centel did not meet its burden of proving that the reported capital structure reflects capital costs reasonably necessary for the

provision of services. The order contradicts the finding that Centel proved its proposed capital costs reasonable.

■ The order shows that the Commission based its approval of the capital structure primarily on its rejection of the evidence of manipulation CUB presented. Again, the Commission apparently acted as an impartial arbiter deciding which party presented the stronger argument. "Requiring intervenors to establish unreasonableness is *** no substitute for requiring proof of reasonableness." (*People ex rel. Hartigan v. Illinois Commerce Comm'n*, 117 Ill. 2d at 135-36.) CUB's failure to prove manipulation of the capital structure is not sufficient to show that the reported capital structure provides an adequate basis for assessing Centel's cost of capital.

A wholly owned subsidiary, like Centel, cannot attract new equity directly. Its effective capital structure applicable to the actual acquisition of equity capital is the capital structure of the parent corporation which sells the stock. Accordingly, the weight of authority from other jurisdictions supports consideration of the parent's capital structure for setting an appropriate cost of capital. (See Annot., 80 A.L.R.4th 280, 285-95 (1990) (and cases cited therein).) On remand the Commission should consider whether the reported capital structure permits Sprint to use Centel's earnings to subsidize risky operations, and whether Centel's studies show that the reported capital structure, and the rate of return based thereon, is reasonably necessary for the provision of services.

## B. COST OF EQUITY

CUB does not quarrel with the rates of return the Commission assigned to Centel's short-term and long-term debt. CUB claims that the Commission allowed Centel an excessive return on equity. The Commission relied on the testimony of the Commission staff's expert, Alan Pregozen, who based his estimates of the cost of equity on his estimates of equity costs for 10 publicly traded utilities with some risk factors comparable to Centel's. He used a discounted cash flow model, which is premised on the assumption that a stock's price is the sum of the expected value of future dividends, discounted to present value by the rate of return investors require. The model is, therefore, an equation using essentially three variables: price, future dividends, and the rate of return.

Pregozen found the stock prices for the 10 comparable utilities in the newspaper, and he estimated future dividends by two different models. For the first model he assumed dividends for the utilities would grow at a constant rate for the indefinite future, and in the second model he assumed that dividends would grow at one rate for

five years, at a steadily accelerating rate for the next 5 or 10 years, and at a constant, even higher rate for the indefinite future thereafter. Using the price and the estimated dividends, he solved the equation for the rate of return. Since the current price of each stock is assumed to be a sum of ratios between expected dividends and the rate of return, overstatement of expected dividends creates an overestimate of the required rate of return.

For his constant growth model Pregozen needed an estimate of the sustainable growth in dividends investors expected the 10 comparable utilities to experience for the indefinite future. Two investment services publish summaries of earnings growth estimates produced by financial analysts employed by brokerage firms. Pregozen used the published estimates of expected growth for the 10 utilities over the next five years as his estimate of constant dividend growth for those utilities for the indefinite future.

After CUB challenged use of these estimates, Pregozen contacted one of the investment services and spoke with an officer of the service who said the five-year growth estimates were sustainable. Pregozen did not say that the officer was a securities analyst or that the investment service which compiled estimates employed any financial analyst to make growth estimates. CUB presented evidence that at least one securities analyst made distinct estimates for five-year growth and long-term sustainable growth. For the one analysis of one utility's expected growth which CUB presented, the estimate of five-year growth was 6.2%, while the estimate of long-term growth was 4.3%. The Commission found that the five-year growth estimates adequately approximated long-term sustainable growth expectations.

For the accelerating growth model, Pregozen used the same published estimates as estimates of growth for the first five years only, and he used 7% as the constant, sustainable growth for all 10 of the comparable utilities. He found the 7% growth rate in a report issued by Prudential-Bache securities. The report explains the models Prudential uses to develop buy, sell and hold recommendations for a wide variety of securities in all industries. In its dividend discount model Prudential uses analysts' projections of growth for five years, but for constant, sustainable growth thereafter, Prudential uses the figure of 7% for every company in every industry. The Commission accepted Pregozen's estimates of cost of equity which are based on the assumption that investors in the 10 utilities he compared to Centel expected those utilities to experience sustainable earnings growth of 7% every year for the indefinite future, founded on Prudential's "estimate."

■ On remand, the Commission should require Pregozen to use

analysts' actual estimates of sustainable long-term growth for the comparable utilities. While Prudential's model may provide a useful benchmark which can aid its analysts in making buy, sell and hold recommendations, the 7% figure used is not, and it does not purport to be, an actual estimate or anyone's expectation of sustainable growth for the comparable utilities. Neither has any securities analyst represented that the five-year growth estimates are actually sustainable long-term growth estimates. If the investment services do not publish compilations of analysts' expectations for sustainable growth or growth over terms longer than five years, the Commission may need to make its own compilation, but the Commission's use of five-year growth estimates as though they were something other than estimates of growth over five years is contrary to the evidence. The Commission's findings concerning cost of equity are, therefore, not supported by substantial evidence in the record.

## V

 The municipalities of Park Ridge, Des Plaines, Mt. Prospect and Glenview filed a brief *amici curiae*. The Commission and Centel moved to strike the brief because the cities rely on evidence not presented to the Commission. According to section 10—201(d) of the Act, "No new or additional evidence may be introduced in any proceeding upon appeal from a[n] *** order or decision of the Commission ***." (220 ILCS 5/10—201(d) (West 1992).) The cities argue that this court should exercise its equitable powers to circumvent the proscription of the Act. Because we have ordered remand for reconsideration of most essential issues, without reference to arguments of *amici*, we find no need to decide whether our equitable powers reach so far. The brief of *amici curiae* is stricken.

 The Commission and Centel also moved to strike from appellants' brief the description of orders entered by the Commission after the decision from which this appeal is taken. Appellants did not refer to the orders as evidence for our consideration on this appeal, nor did appellants rely on the orders in any of the arguments considered above. The Commission and Centel admit appellants correctly describe the subsequent orders. Appellees cite no authority supporting their request to strike these sentences from the brief. Therefore the motion is denied.

 Section 10—201 of the Act (220 ILCS 5/10—201(a) (West 1992)) gives this court jurisdiction over appeals from Commission decisions. This court's power to decide appeals precludes the Commission from entering any order which would effectively interfere with this court's review of the order from which appeal is taken. (See

*Bachewicz v. American National Bank & Trust Co.* (1985), 135 Ill. App. 3d 294, 297-98, 482 N.E.2d 95; *Waste Management of Illinois, Inc. v. Pollution Control Board* (1990), 201 Ill. App. 3d 614, 621, 558 N.E.2d 1295, *rev'd on other grounds* (1991), 145 Ill. 2d 345, 585 N.E.2d 606.) Thus, the Commission's subsequent orders cannot be construed to interfere with our jurisdiction here. To give this court's remand effect, the Commission's decision on remand must supersede any orders entered in this case after the order from which this appeal is taken. The Commission will especially need to reconsider any orders premised on the correctness of the decision which we hereby reverse. We do not herein review any such orders.

For the reasons stated above, the decision of the Commission is reversed and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

COUSINS, P.J., and GORDON, J., concur.