# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2013 IL App (4th) 121008

| | |
|---|---|
| Appellate Court Caption | AMEREN ILLINOIS COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION; THE CITIZENS UTILITY BOARD; AARP; THE COMMERCIAL GROUP (Best Buy Company Inc., J.C. Penney Corporation, Inc., Macy's, Inc., Sam's West, Inc., and Wal-Mart Stores, Inc.); THE INDUSTRIAL ENERGY CONSUMERS (Air Products and Chemicals Company, Archer-Daniels-Midland Company, Caterpillar, Inc., CCPS Transportation, LLC, GBC Metals, LLC, Keystone Consolidated Industries, Inc., Marathon Petroleum Company, LP, Olin Corporation, Tate and Lyle Ingredients Americas, Inc., University of Illinois, Viscofan USA, Inc., and Washington Mills Hennepin, Inc.); THE OFFICE OF THE ATTORNEY GENERAL; and THE PEOPLE OF THE STATE OF ILLINOIS, Respondents.–AMEREN ILLINOIS COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, THE CITIZENS UTILITY BOARD, AARP, THE OFFICE OF THE ATTORNEY GENERAL, and THE PEOPLE OF THE STATE OF ILLINOIS, Respondents. |
| District & No. | Fourth District<br>Docket Nos. 4-12-1008, 4-13-0029 cons. |
| Filed<br>Modified upon<br>denial of rehearing | December 11, 2013<br><br>January 28, 2014 |

Held

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

In proceedings on petitioner's application to establish a performance-based rate tariff under section 16-108.5 of the Public Utilities Act, commonly known as the Energy Infrastructure Modernization Act, the Illinois Commerce Commission properly reduced petitioner's proposed rate of common equity to make it more consistent with the common equity of petitioner's holding company, considered petitioner's accumulated deferred income taxes for projected plant additions in calculating petitioner's rate base, and decreased petitioner's rate base by unused vacation pay accrued by its employees.

Decision Under Review

Petition for review of orders of Illinois Commerce Commission, Nos. 12-0001, 12-0293.

Judgment

Affirmed.

Counsel on Appeal

Albert D. Sturtevant, of Whitt Sturtevant LLP, of Chicago, Edward C. Fitzhenry, of Ameren Services Company, of St. Louis, Missouri, and Mark A. Whitt (argued) and Andrew J. Campbell, both of Whitt Sturtevant LLP, of Columbus, Ohio, for petitioner.

John P. Kelliher and James E. Weging (argued), Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission.

Julie L. Soderna, Kristin Munsch, Christie Redd Hicks, and Orijit Ghoshal, all of Citizens Utility Board, of Chicago, for respondent Citizens Utility Board.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Jane Elinor Notz, Janice A. Dale, Karen L. Lusson, Susan L. Satter, Timothy O'Brien, and Brian F. Barov, Assistant Attorneys General, of counsel), for respondents Office of the Attorney General and the People.

Eric Robertson and Andrew Rankin, both of Lueders, Robertson & Konzen, LLC, of Granite City, and Conrad R. Reddick, of Wheaton, for other respondents.

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Justices Appleton and Pope concurred in the judgment and opinion.

## OPINION

¶ 1      In January 2012, Ameren Illinois Company (Ameren) filed its initial application with the Illinois Commerce Commission (Commission) to establish a performance-based rate tariff under the authority of section 16-108.5 of the Public Utilities Act (Utilities Act), commonly referred to as the Energy Infrastructure Modernization Act (Modernization Act) (220 ILCS 5/16-108.5 (West 2012)), enacted by Public Act 97-616 (Pub. Act 97-616, § 10 (eff. Oct. 26, 2011)). Following a September 2012 evidentiary hearing, the Commission issued a written decision in which, among other things, it (1) rejected and subsequently reduced Ameren's proposed rate of common equity so that it was more consistent with the common equity of Ameren's holding company, Ameren Company (holding company); (2) considered Ameren's accumulated deferred income taxes (ADIT) for projected plant additions in calculating Ameren's rate base; and (3) decreased Ameren's rate base by unused vacation pay accrued by Ameren employees.

¶ 2      In April 2012, Ameren filed its first annual update with the Commission. In December 2012, the Commission reaffirmed the aforementioned findings.

¶ 3      On appeal, Ameren asserts the Commission made three reversible errors in reaching its decision, including (1) considering the capital structure of Ameren's holding company rather than the actual capital structure of Ameren when determining rate base; (2) reducing Ameren's rate base by ADIT for projected plant additions; and (3) decreasing Ameren's rate base by unused vacation pay accrued by Ameren employees.

¶ 4      We affirm.

¶ 5                              I. BACKGROUND

¶ 6      Ameren is a public utility that distributes electricity and gas to customers in Illinois. As a public utility, Ameren's rates are subject to regulation by the State of Illinois pursuant to the Utilities Act (220 ILCS 5/9-101 to 22-503 (West 2012)), through which the General Assembly has delegated to the Commission the authority to review the rates suggested by public utilities to determine whether those rates are "just and reasonable." 220 ILCS 5/9-201(c) (West 2012).

¶ 7                            A. Modernization Act

¶ 8      In 2011, the General Assembly passed the Modernization Act (220 ILCS 5/16-108.5 (West 2012)) as a provision of the Utilities Act (220 ILCS 5/1-101 to 22-503 (West 2012)).

The Modernization Act applies to electric utilities or combination gas and electric utilities serving more than 1 million customers in Illinois that voluntarily undertake to create customer assistance programs and invest in an infrastructure program that creates Illinois jobs. 220 ILCS 5/16-108.5(b) (West 2012). To participate, a utility company must commit to one of the following investment plans. The first option requires the utility company, within 5 years, to invest $1.3 billion "in electric system upgrades, modernization projects, and training facilities" and, within 10 years, to invest $1.3 billion "to upgrade and modernize its transmission and distribution infrastructure." 220 ILCS 5/16-108.5(b)(1)(A), (b)(1)(B) (West 2012). The second option requires the utility company, over a 10-year period, to invest $265 million "in electric system upgrades, modernization projects, and training facilities" and to invest $360 million "to upgrade and modernize its transmission and distribution infrastructure." 220 ILCS 5/16-108.5(b)(2)(A), (b)(2)(B) (West 2012). The incentive for utility companies to participate in this program is that the statute allows the company to recover its expenditures through the ratemaking process. 220 ILCS 5/16-108.5(b) (West 2012).

¶ 9                    B. Ameren's Initial Application Under the Modernization Act

¶ 10        In January 2012, Ameren filed with the Commission a petition for approval of its "Modernization Action Plan-Pricing Tariff" pursuant to the Modernization Act (Illinois Commerce Commission case No. 12-0001 (No. 12-0001)). Several parties intervened, including (1) the Attorney General on behalf of the People of the State of Illinois, (2) the Citizens Utility Board, (3) the American Association of Retired Persons (AARP), (4) the Illinois Industrial Energy Consumers, and (5) the Commercial Group. In September 2012, following an evidentiary hearing and briefing by all parties, including Commission staff, the Commission approved Ameren's application with several modifications, including (1) rejecting and subsequently reducing Ameren's proposed rate of common equity so that it was more consistent with the common equity of Ameren's holding company, Ameren Company; (2) considering ADIT on projected plant additions in calculating Ameren's rate base; and (3) decreasing Ameren's rate base by unused vacation pay accrued by Ameren employees. Ameren filed an application for rehearing, which the Commission denied in October 2012. Ameren then filed a timely notice of appeal challenging, among other issues, the Commission's findings with regard to Ameren's (1) rate of common equity in calculating actual capital structure and (2) ADIT on projected plant additions. This court docketed Ameren's appeal as No. 4-12-1008.

¶ 11                    C. Ameren's Annual Update Filing

¶ 12        In April 2012, while Ameren's application in No. 12-0001 was still pending, Ameren filed its first annual update with the Commission as required by the Modernization Act (Illinois Commerce Commission case No. 12-0293 (No. 12-0293)). In December 2012, the Commission issued its written findings consistent with No. 12-0001. The Commission then denied Ameren's January 2013 motion requesting a rehearing. Ameren filed a timely notice of appeal challenging, among others issues, the Commission's decisions with regard to (1)

reducing Ameren's common equity as more consistent with Ameren's holding company, (2) considering ADIT on projected plant additions in calculating rate base, and (3) decreasing Ameren's rate base by unused vacation pay accrued by Ameren employees. Ameren then filed a timely notice of appeal, which this court docketed as No. 4-13-0029. We have consolidated both cases for review.

¶ 13             D. May 2013 Amendment to the Modernization Act

¶ 14    In May 2013, Public Act 98-15 (Pub. Act 98-15, § 5 (eff. May 22, 2013)) amended the Modernization Act, and those amendments applied retroactively to the proceedings at issue in the present cases. 220 ILCS 5/16-108.5 (West 2012) (enacted by Public Act 98-15 (Pub. Act 98-15, § 5 (eff. May 22, 2013))). Ameren subsequently filed motions in both cases to have several issues declared moot, and the appellees did not object. Thus, this court will address only the remaining issues.

¶ 15                      II. ANALYSIS

¶ 16    On appeal, Ameren asserts the Commission erred by (1) considering the capital structure of Ameren's holding company rather than the actual capital structure of Ameren when determining rate base; (2) reducing Ameren's rate base by ADIT for projected plant additions; and (3) decreasing Ameren's rate base by unused vacation pay accrued by Ameren employees. We address each of these contentions in turn.

¶ 17                  A. Standard of Review

¶ 18    This is a case of first impression, requiring this court to review and interpret the statutory provisions of the Modernization Act in the context of the Utilities Act. Issues of statutory interpretation are reviewed *de novo*. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380, 899 N.E.2d 227, 232 (2008). However, the Utilities Act provides that the Commission's findings of fact are considered *prima facie* reasonable and the burden of proof on all issues raised upon appeal is on the challenging party. 220 ILCS 5/10-201(d) (West 2012). Review of the Commission's factual findings is generally limited to whether (1) the Commission acted within its authority, (2) the Commission made adequate findings to support its position, (3) the decision is supported by substantial evidence, and (4) constitutional rights have been violated. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 9, 958 N.E.2d 405. Substantial evidence consists of evidence a reasoning mind would accept as sufficient to support the challenged finding; it is more than a scintilla of evidence but requires something less than a preponderance of the evidence. *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 479, 644 N.E.2d 817, 823 (1994).

¶ 19    Given the highly technical nature of calculating the costs incurred by a public utility, judicial deference is "especially appropriate in the area of fixing rates." *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442, 167 N.E.2d 414, 417 (1960). The Commission's findings of fact will not be overturned unless they are against the

manifest weight of the evidence. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 409, 937 N.E.2d 685, 706 (2010). When the Commission's decision presents a question of mixed law and fact, we review the Commission's order under the clearly erroneous standard. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 8, 964 N.E.2d 510. "The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and as such, it grants some deference to the agency's decision." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 9, 964 N.E.2d 510. In that circumstance, the reviewing court must be left with a "definite and firm conviction" that the Commission committed a mistake. (Internal quotation marks omitted.) *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 9, 964 N.E.2d 510.

¶ 20                                B. Issues Raised by Ameren

¶ 21                                1. *Actual Capital Structure*

¶ 22     Ameren argues the Commission erred by imputing to Ameren the actual capital structure of Ameren's holding company. Actual capital structure consists of (1) short-term debt, (2) long-term debt, and (3) common equity. See, *e.g.*, *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 5, 958 N.E.2d 405. The parties' chief contention on appeal is the rate of common equity adopted by the Commission.

¶ 23     In No. 12-0001, in determining its actual capital structure, Ameren estimated its common equity at 54.30%, while its holding company had common equity in the amount of 52.24%. Commission staff estimated Ameren's common equity at 51.49%, a figure adopted by the Commission after an extensive hearing. In No. 12-0293, Ameren estimated its common equity at 54.85%, while its holding company had common equity in the amount of 51.05%. Commission staff estimated Ameren's common equity at 51%, a figure adopted by the Commission. In both instances, the Commission adopted for Ameren a common equity figure below that of the holding company.

¶ 24     In adopting the respective rates of common equity, the Commission made detailed findings. In No. 12-0001, the Commission noted Ameren had a lower overall operating risk than its holding company due to Ameren's lack of competition and participation in the Modernization Act; thus, the Commission found that adopting the common equity ratio suggested by Ameren would ultimately expose Ameren to more risk than its holding company because the percentage of common equity was too high for a company that possessed less operating risk. Ameren's credit rating had also recently been increased by Moody's Investors Service, which gave Ameren the ability to obtain more favorable rates. After considering Ameren's advantageous regulatory environment, the Commission found Ameren's rate unreasonable and adopted the Commission staff's recommended rate, which the Commission deemed more reasonable.

¶ 25     In No. 12-0293, the Commission deferred, in part, to its ruling in No. 12-0001. The Commission noted other utilities with a similar credit rating had much lower common equity rates in the range of 40%, which indicated a lower degree of financial risk. The Commission commented it was in Ameren's best interests to use a capital structure with higher common

equity because it would allow Ameren a greater return on its capital while leaving ratepayers to shoulder the increased cost of capital. Additionally, in No. 12-0293, the Commission stated, "individually, the concerns raised by Staff are insufficient to win the day. But cumulatively, the Commission is persuaded that Staff's imputed capital structure is appropriate."

¶ 26    Subsection (c)(2) of the Modernization Act requires formula rates to "[r]eflect the utility's actual capital structure for the applicable calendar year, excluding goodwill, subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(2) (West 2012). Section 9-230 of the Utilities Act provides, "In determining a reasonable rate of return upon investment for any public utility in any proceeding to establish rates or charges, the Commission shall not include any (i) incremental risk, [or] (ii) increased cost of capital *** which is the direct or indirect result of the public utility's affiliation with unregulated or nonutility companies." 220 ILCS 5/9-230 (West 2012).

¶ 27    Ameren asserts the Commission failed to follow the plain language of the statute by ignoring Ameren's "actual capital structure" and instead relying upon the capital structure of Ameren's holding company. Additionally, Ameren reasons the statutory language requires the Commission to presume Ameren's proposed actual capital structure is appropriate and that the presumption can only be overcome if the Commission reviews the rate and finds it unreasonable. Ameren contends the Commission not only failed to make an express finding of unreasonableness but also improperly shifted the burden to Ameren to prove the reasonableness of its rates. Finally, Ameren argues its common equity rate should be higher because the regulatory environment insulated Ameren from its holding company's greater risk profile.

¶ 28    The Commission, in turn, argues the statutory language does not create a presumption of validity but instead provides the Commission discretion to find Ameren's proposed actual capital structure unreasonable, authority which the Commission exercised in reaching its decision. Specifically, the Commission argues section 9-230 of the Utilities Act (220 ILCS 5/9-230 (West 2012)) grants the Commission the authority to set reasonable rates on return of investments. The Commission further contends, though it did not make an express finding of unreasonableness, its detailed finding implied that it found Ameren's proposals to be unreasonable due, in part, to the inconsistency between Ameren's and its holding company's rates of common equity.

¶ 29    The plain language of the statute provides the Commission with the discretion to determine whether Ameren's proposed actual capital structure is prudent and reasonable. We disagree with Ameren's contention that the statutory language creates a presumption of reasonableness when read in conjunction with provisions of the Utilities Act. See 220 ILCS 5/9-230 (West 2012) (the Commission has the authority to determine the reasonableness of a utility's rate of return). We also disagree the Commission either failed to make a finding of reasonableness or shifted the burden of proof onto Ameren to prove the reasonableness of the rate of common equity. The parties presented extensive evidence and the Commission determined the Commission staff's position was reasonable, thus rejecting Ameren's proposed rates as unreasonable. Therefore, we conclude the Commission both possessed and

exercised its authority in adopting the Commission staff's recommendation. We must now determine whether the Commission's findings of fact were against the manifest weight of the evidence. *Commonwealth Edison Co.*, 405 Ill. App. 3d at 409, 937 N.E.2d at 706.

¶ 30        "Generally, equity is a more expensive form of capital than debt." *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 283 Ill. App. 3d 188, 204, 669 N.E.2d 919, 931 (1996). "[B]ecause debt payments are generally tax deductible while dividend payments are not, debt costs less than equity." *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 744, 658 N.E.2d 1194, 1204 (1995). In other words, "the more equity in a utility's capital structure, the higher the ROR [rate of return] must be to cover the cost of capital." *Illinois Bell Telephone Co.*, 283 Ill. App. 3d at 204, 669 N.E.2d at 931(citing *Citizens Utility Board*, 276 Ill. App. 3d at 744, 658 N.E.2d at 1204). "Reasonable persons will purchase a corporation's securities only if they expect to receive later their initial investment plus a reasonable return. When they invest, they understand that they risk the possibility that the corporation may go out of business, and the investors may lose all or part of their investments. As the perceived risk of loss increases, the amount of return investors demand increases." *Citizens Utility Board*, 276 Ill. App. 3d at 743-44, 658 N.E.2d at 1204.

¶ 31        The common equity figures adopted by the Commission permitted Ameren a favorable equity rate, better than other utilities with the same credit rating, and reflected Ameren's low-risk regulatory environment. To allow Ameren to obtain a higher rate of common equity under these circumstances would, as the Commission explained, allow Ameren a greater return on its capital while leaving ratepayers to shoulder the increased cost of capital. Because Ameren has decreased risk due to its regulatory environment and lack of competition, it stands to reason investors would expect a lesser rate of return on their investment. Additionally, the record reflects the Commission did not adopt the actual capital structure of the holding company in setting Ameren's rates. In No. 12-0001, the holding company's common equity was 52.24%, but the Commission implemented a rate of 51.49% for Ameren. Likewise, in No. 12-0293, the holding company's common equity was 51.05%, but the Commission adopted a common equity rate of 51% for Ameren. In both cases, the common equity was set just below the rate of the holding company, which illustrates the Commission's finding that Ameren has less risk than the holding company and, thus, less need for higher rates of common equity.

¶ 32        The Commission acted within its authority and made adequate, detailed findings on the substantial evidence presented. Therefore, we conclude the Commission did not err in finding that Ameren's rate was unreasonable and its subsequent adoption of the modified rate of common equity in both cases.

¶ 33                              2. *Accumulated Deferred Income Taxes*

¶ 34        Ameren contends the Commission erred by reducing Ameren's rate base by ADIT for projected plant additions. "ADIT quantifies the income taxes that are deferred when the tax law provides for deductions with respect to an item in a year other than the year that the item is treated as an expense for financial reporting purposes." (Internal quotation marks omitted.) *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2012 IL App (4th) 100962, ¶ 11, 967

N.E.2d 298. For regulated utilities, ADIT reduces the utility's rate base because it is treated as no-cost capital. *Ameren Illinois Co.*, 2012 IL App (4th) 100962, ¶ 11, 967 N.E.2d 298. In other words, ADIT represents taxes payable in the future that provide a source of funds the utility can use until such time the taxes become due.

¶ 35 Subsection (c)(6) of the Modernization Act requires participating utilities to present to the Commission:

"final data based on its most recently filed FERC Form 1 [(Annual Report of Major Electric Utilities as required by the Federal Energy Regulatory Commission)], plus projected plant additions and correspondingly updated depreciation reserve and expense for the calendar year in which the tariff and data are filed, that shall populate the performance-based formula rate and set the initial delivery services rates under the formula." 220 ILCS 5/16-108.5(c)(6) (West 2012).

Additionally, the statute provides "[n]othing in this Section is intended to allow costs that are not otherwise recoverable to be recoverable by virtue of inclusion in FERC Form 1." 220 ILCS 5/16-108.5(c)(6) (West 2012).

¶ 36 When the Commission calculated Ameren's rate base, it deducted ADIT for projected plant additions, which reduced Ameren's rate base by over $100 million in No. 12-0001 and nearly $44 million in No. 12-0293. An AARP witness, in reaching the $44 million figure, determined "the existence of 50% bonus depreciation in 2012 provides [Ameren] with a tax deduction equal to one-half of the amount of additions to plant in service, which would lead to growth in the balance of ADIT in 2012 well in excess of growth that would take place in absence of bonus depreciation." Witnesses for Commission staff and the Citizens Utility Board suggested similar adjustments.

¶ 37 Ameren argues the Modernization Act did not provide the Commission with the authority to deduct ADIT because, while the statute provides guidance for other adjustments, the statute fails to mention an adjustment for ADIT. Ameren further asserts the omission of ADIT adjustments in the statute was proper because ADIT does not represent "transparent information" required for calculating formulas under the Modernization Act, which it illustrates with the experts' varying approximations of ADIT ranging from $108 million to $173 million. Moreover, Ameren explains the reconciliation process in the Modernization Act eliminated the need for the traditional ADIT adjustment because the reconciliation rate relies upon "actual costs" incurred by Ameren in supplying gas and electricity.

¶ 38 The Commission contends it is common practice to make ADIT adjustments to a rate base, and the Commission has the authority under the Modernization Act to rely on its common practices in determining a just and reasonable rate. 220 ILCS 5/16-108.5(c)(6) (West 2012). The Commission notes Ameren used ADIT for years in calculating its rate base and points out that only now under the Modernization Act does Ameren seek to exclude this adjustment. While the Commission agrees the statute does not expressly allow an adjustment for ADIT, the Commission explains the statute does not expressly disallow the adjustment, but authorizes the Commission to exercise its discretion in determining just and reasonable rates.

¶ 39 The Modernization Act expressly prohibits a utility from recovering above and beyond

what would normally be recoverable in a ratemaking case. 220 ILCS 5/16-108.5(c)(6) (West 2012); see also *Commonwealth Edison Co.*, 405 Ill. App. 3d at 405, 937 N.E.2d at 703 (The Utilities Act "requires the Commission to ensure that a utility's approved rate base does not exceed the investment value that the utility actually uses to provide service."). The Commission asserts that ignoring the ADIT figure would do just that–allow Ameren to recover an unjust and unreasonable rate base that has been inflated by no-cost capital for the benefit of Ameren. We agree. Omitting ADIT from the rate base calculation would allow Ameren what amounts to an interest-free loan at the ratepayers' expense that would artificially increase Ameren's rates until the next reconciliation process, a result which is neither just nor reasonable for ratepayers. As Ameren noted, the reconciliation process will allow Ameren to recover its actual costs of the forecasted ADIT for projected plant additions in the event of a miscalculation during the ratemaking process.

¶ 40    As it was consistent with the common practice of the Commission to include ADIT in the ratemaking process, we conclude the Commission did not err by including the ADIT adjustment for projected plan additions in its ratemaking calculation.

¶ 41                            3. *Vacation Pay*

¶ 42    Ameren's final argument on appeal is that the Commission erred in determining accrued but unused vacation pay, an amount of more than $12 million, was an operating reserve that should be deducted from the rate base. We begin by noting Ameren did not challenge this issue in No 12-0001. Instead, this argument was presented for the first time on appeal in No. 12-0293.

¶ 43    Ameren asserts the Commission had the discretion in the proceedings at issue in No. 12-0293 to alter the rate base by removing the reduction for accrued vacation pay but cites no authority in support of this argument. Additionally, Ameren contends the Commission issued a conclusory finding that accrued vacation pay was an operating reserve and that the finding was against the manifest weight of the evidence.

¶ 44    We initially note it has not been consistent with the Commission's practice or law to reduce a public utility's rate base by accrued vacation pay; in fact, the Commission has only done so in this case and in Commonwealth Edison's related case (Illinois Commerce Commission No. 11-0721, order of May 29, 2012), which is now pending on appeal. The Commission's assertion that accrued but unused vacation pay results in additional monies for Ameren's use is suspect given Ameren's liabilities associated with the funds. However, because of our discussion below, we are not required to decide whether a reduction of the rate base by accrued but unused vacation pay is appropriate.

¶ 45    We agree with the Commission's argument that it lacked authority in No. 12-0293 to recalculate the rate base during the reconciliation proceedings. Subsection (c) of the Modernization Act pertains to the establishment of the initial performance-based formula rate, while subsection (d) governs proceedings during the annual reconciliation process. 220 ILCS 5/16-108.5(c), (d) (West 2012). Subsection (d)(1) provides "[t]he first such reconciliation is not intended to provide for the recovery of costs previously excluded from rates based on a prior Commission order finding of imprudence or unreasonableness." 220

-10-

ILCS 5/16-108.5(d)(1) (West 2012). Under subsection (d)(3), "the Commission shall not *** have the authority in a proceeding under this subsection (d) to consider or order any changes to the structure or protocols of the performance-based formula rate approved pursuant to subsection (c) of this Section." 220 ILCS 5/16-108.5(d)(3) (West 2012). In other words, the plain, unambiguous language of subsections (d)(1) and (d)(3) prohibited the Commission from reconsidering the initial performance-based formula rate during the first annual reconciliation proceeding at issue in No. 12-0293. 220 ILCS 5/16-108.5(d)(1), (d)(3) (West 2012).

¶ 46    We therefore conclude the Commission lacked the authority to recalculate the rate base during the first reconciliation proceeding and properly refused to alter the rate base by removing the calculation for accrued but unused vacation pay.

¶ 47                                    III. CONCLUSION

¶ 48    For the reasons stated above, we affirm the findings of the Commission.

¶ 49    Affirmed.