# Illinois Official Reports

## Appellate Court

*Adams County Property Owners & Tenant Farmers v. Illinois Commerce Comm'n*,
2015 IL App (4th) 130907

| | |
|---|---|
| Appellate Court Caption | ADAMS COUNTY PROPERTY OWNERS AND TENANT FARMERS, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; DONNA ALLEN; CENTRAL STONE COMPANY; ENBRIDGE PIPELINES (ILLINOIS), L.L.C.; PRAIRIE POWER, INC.; THE CITY OF CHAMPAIGN; FUTUREGEN INDUSTRIAL ALLIANCE, INC.; IBEW LOCAL 51; BETH BAUER; NANCY N. MADIGAN; BARBARA BERGSCHNEIDER; JOSEPH BERGSCHNEIDER; DAVID G. BOCKHOLD; THERESA M. BOCKHOLD; MISO; WIND ON THE WIRES; PRAIRIE POWER, INC.; GAN PROPERTIES, LLC; SCHUYLER COUNTY PROPERTY OWNERS; NIEMANN FOODS, INC.; MICHAEL T. CODY; AMEREN TRANSMISSION COMPANY OF ILLINOIS; ANNE MAE COPELAND; PAMELA J. COPELAND; RICHARD T. COPELAND, JR.; THE VILLAGE OF SAVOY; AMEREN SERVICES COMPANY; ERBON DOAK; MIDWEST INDEPENDENT TRANSMISSION SYSTEM OPERATOR, INC.; BARKI/ADAMS COUNTY PROPERTY OWNERS; THE VILLAGE OF SIDNEY; LYNDA McLAUGHLIN; THE NATURE CONSERVANCY; KOHL WHOLESALE; ILLINOIS AGRICULTURAL ASSOCIATION; THE VILLAGE OF MT. ZION; IBEW LOCAL 702; MICHAEL HUTCHINSON; PAMELA P. IRWIN; ENBRIDGE ENERGY COMPANY, INC.; MORGAN COUNTY PROPERTY OWNERS; CLEAN LINE ENERGY PARTNERS, LLC; WESTERN MORGAN COUNTY PROPERTY OWNERS; DYNEGY, INC.; MICHAEL E. LOCKWOOD; ILLINOIS LABORERS AND CONTRACTORS TRAINING TRUST FUND; THOMAS McLAUGHLIN; WIESE FARMS; EDNA KEPLINGER TRUST; PEGGY MILLS; RURAL CLARK AND EDGAR COUNTY CONCERNED CITIZENS; THE VILLAGE OF PAWNEE; MATT HOLTMEYER CONSTRUCTION, INC.; SHELBY COUNTY LANDOWNERS GROUP; GREGORY A. PEARCE; THERESA PEARCE; JAMES PHILLIPS; TORI PHILLIPS; BARBARA RAGHEB; MAGDI RAGHEB; BRIAN RALSTON; SHERRY L. RALSTON; JUSTIN RAMEY; ANN RAYNOLDS; MOULTRIE COUNTY PROPERTY |

OWNERS; JANEY RONEY; DEBORAH D. ROONEY; DONNA RUHOLL; STEVE RUHOLL; RCECCC; CLARK COUNTY PRESERVATION COMMITTEE; JDL BROADCASTING, INC.; LAURA TE GROTENHUIS; PIATT, DOUGLAS, MOULTRIE, AND CHRISTIAN COUNTY PROPERTY OWNERS; and MARK LASH, Respondents.–EDGAR COUNTY CITIZENS, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; DONNA ALLEN; CENTRAL STONE COMPANY; ENBRIDGE PIPELINES (ILLINOIS), L.L.C.; PRAIRIE POWER, INC.; THE CITY OF CHAMPAIGN; FUTUREGEN INDUSTRIAL ALLIANCE, INC.; IBEW LOCAL 51; BETH BAUER; NANCY N. MADIGAN; BARBARA BERGSCHNEIDER; JOSEPH BERGSCHNEIDER; DAVID G. BOCKHOLD; THERESA M. BOCKHOLD; MISO; WIND ON THE WIRES; PRAIRIE POWER, INC; GAN PROPERTIES, LLC; SCHUYLER COUNTY PROPERTY OWNERS; NIEMANN FOODS, INC.; MICHAEL T. CODY; AMEREN TRANSMISSION COMPANY OF ILLINOIS; ANNE MAE COPELAND; PAMELA J. COPELAND; RICHARD T. COPELAND, JR.; THE VILLAGE OF SAVOY; AMEREN SERVICES COMPANY; ERBON DOAK; MIDWEST INDEPENDENT TRANSMISSION SYSTEM OPERATOR, INC.; BARKI/ADAMS COUNTY PROPERTY OWNERS; THE VILLAGE OF SIDNEY; LYNDA McLAUGHLIN; THE NATURE CONSERVANCY; KOHL WHOLESALE; ILLINOIS AGRICULTURAL ASSOCIATION; THE VILLAGE OF MT. ZION; IBEW LOCAL 702; MICHAEL HUTCHINSON; PAMELA P. IRWIN; ENBRIDGE ENERGY COMPANY, INC.; MORGAN COUNTY PROPERTY OWNERS; CLEAN LINE ENERGY PARTNERS, LLC; WESTERN MORGAN COUNTY PROPERTY OWNERS; DYNEGY, INC.; MICHAEL E. LOCKWOOD; ILLINOIS LABORERS AND CONTRACTORS TRAINING TRUST FUND; THOMAS McLAUGHLIN; WIESE FARMS; EDNA KEPLINGER TRUST; PEGGY MILLS; RURAL CLARK AND EDGAR COUNTY CONCERNED CITIZENS; THE VILLAGE OF PAWNEE; MATT HOLTMEYER CONSTRUCTION, INC.; SHELBY COUNTY LANDOWNERS GROUP; GREGORY A. PEARCE; THERESA PEARCE; JAMES PHILLIPS; TORI PHILLIPS; BARBARA RAGHEB; MAGDI RAGHEB; BRIAN RALSTON; SHERRY L. RALSTON; JUSTIN RAMEY; ANN RAYNOLDS; MOULTRIE COUNTY PROPERTY OWNERS; JANEY RONEY; DEBORAH D. ROONEY; DONNA RUHOLL; STEVE RUHOLL; RCECCC; CLARK COUNTY PRESERVATION COMMITTEE; JDL BROADCASTING, INC.; LAURA TE GROTENHUIS; PIATT, DOUGLAS, MOULTRIE, AND CHRISTIAN COUNTY PROPERTY OWNERS; and MARK LASH, Respondents.–MORGAN, SANGAMON, and SCOTT COUNTIES

- 2 -

LAND PRESERVATION GROUP, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; DONNA ALLEN; CENTRAL STONE COMPANY; ENBRIDGE PIPELINES (ILLINOIS), L.L.C.; PRAIRIE POWER, INC.; THE CITY OF CHAMPAIGN; FUTUREGEN INDUSTRIAL ALLIANCE, INC.; IBEW LOCAL 51; BETH BAUER; NANCY N. MADIGAN; BARBARA BERGSCHNEIDER; JOSEPH BERGSCHNEIDER; DAVID G. BOCKHOLD; THERESA M. BOCKHOLD; MISO; WIND ON THE WIRES; GAN PROPERTIES, LLC; SCHUYLER COUNTY PROPERTY OWNERS; NIEMANN FOODS, INC.; MICHAEL T. CODY; AMEREN TRANSMISSION COMPANY OF ILLINOIS; ANNE MAE COPELAND; PAMELA J. COPELAND; RICHARD T. COPELAND, JR.; THE VILLAGE OF SAVOY; AMEREN SERVICES COMPANY; ERBON DOAK; MIDWEST INDEPENDENT TRANSMISSION SYSTEM OPERATOR, INC.; BARKI/ADAMS COUNTY PROPERTY OWNERS; THE VILLAGE OF SIDNEY; LYNDA McLAUGHLIN; THE NATURE CONSERVANCY; KOHL WHOLESALE; ILLINOIS AGRICULTURAL ASSOCIATION; THE VILLAGE OF MT. ZION; IBEW LOCAL 702; MICHAEL HUTCHINSON; PAMELA P. IRWIN; ENBRIDGE ENERGY COMPANY, INC.; MORGAN COUNTY PROPERTY OWNERS; CLEAN LINE ENERGY PARTNERS, LLC; WESTERN MORGAN COUNTY PROPERTY OWNERS; DYNEGY, INC.; MICHAEL E. LOCKWOOD; ILLINOIS LABORERS AND CONTRACTORS TRAINING TRUST FUND; THOMAS McLAUGHLIN; WIESE FARMS; EDNA KEPLINGER TRUST; PEGGY MILLS; RURAL CLARK AND EDGAR COUNTY CONCERNED CITIZENS; THE VILLAGE OF PAWNEE; MATT HOLTMEYER CONSTRUCTION, INC.; SHELBY COUNTY LANDOWNERS GROUP; GREGORY A. PEARCE; THERESA PEARCE; JAMES PHILLIPS; TORI PHILLIPS; BARBARA RAGHEB; MAGDI RAGHEB; BRIAN RALSTON; SHERRY L. RALSTON; JUSTIN RAMEY; ANN RAYNOLDS; MOULTRIE COUNTY PROPERTY OWNERS; JANEY RONEY; DEBORAH D. ROONEY; DONNA RUHOLL; STEVE RUHOLL; RCECCC; CLARK COUNTY PRESERVATION COMMITTEE; JDL BROADCASTING, INC.; LAURA TE GROTENHUIS; PIATT, DOUGLAS, MOULTRIE, AND CHRISTIAN COUNTY PROPERTY OWNERS; MARK LASH; DEAN L. McWARD; DONALD C. McWARD; SHIRLEY McWARD; EDWARD CORLEY TRUST; and ERIC SPRAGUE, and LAURA SPRAGUE, Respondents.–MACON COUNTY PROPERTY OWNERS, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; DONNA ALLEN; CENTRAL STONE COMPANY; ENBRIDGE PIPELINES (ILLINOIS), L.L.C.; PRAIRIE POWER, INC.; THE CITY OF CHAMPAIGN;

FUTUREGEN INDUSTRIAL ALLIANCE, INC.; IBEW LOCAL 51; BETH BAUER; NANCY N. MADIGAN; BARBARA BERGSCHNEIDER; JOSEPH BERGSCHNEIDER; DAVID G. BOCKHOLD; THERESA M. BOCKHOLD; MISO; WIND ON THE WIRES; GAN PROPERTIES, LLC; SCHUYLER COUNTY PROPERTY OWNERS; NIEMANN FOODS, INC.; MICHAEL T. CODY; AMEREN TRANSMISSION COMPANY OF ILLINOIS; ANNE MAE COPELAND; PAMELA J. COPELAND; RICHARD T. COPELAND, JR.; THE VILLAGE OF SAVOY; AMEREN SERVICES COMPANY; ERBON DOAK; MIDWEST INDEPENDENT TRANSMISSION SYSTEM OPERATOR, INC.; BARKI/ADAMS COUNTY PROPERTY OWNERS; THE VILLAGE OF SIDNEY; LYNDA McLAUGHLIN; THE NATURE CONSERVANCY; KOHL WHOLESALE; ILLINOIS AGRICULTURAL ASSOCIATION; THE VILLAGE OF MT. ZION; IBEW LOCAL 702; MICHAEL HUTCHINSON; PAMELA P. IRWIN; ENBRIDGE ENERGY COMPANY, INC.; MORGAN COUNTY PROPERTY OWNERS; CLEAN LINE ENERGY PARTNERS, LLC; WESTERN MORGAN COUNTY PROPERTY OWNERS; DYNEGY, INC.; MICHAEL E. LOCKWOOD; ILLINOIS LABORERS AND CONTRACTORS TRAINING TRUST FUND; THOMAS McLAUGHLIN; WIESE FARMS; EDNA KEPLINGER TRUST; PEGGY MILLS; RURAL CLARK AND EDGAR COUNTY CONCERNED CITIZENS; THE VILLAGE OF PAWNEE; MATT HOLTMEYER CONSTRUCTION, INC.; SHELBY COUNTY LANDOWNERS GROUP; GREGORY A. PEARCE; THERESA PEARCE; JAMES PHILLIPS; TORI PHILLIPS; BARBARA RAGHEB; MAGDI RAGHEB; BRIAN RALSTON; SHERRY L. RALSTON; JUSTIN RAMEY; ANN RAYNOLDS; MOULTRIE COUNTY PROPERTY OWNERS; JANEY RONEY; DEBORAH D. ROONEY; DONNA RUHOLL; STEVE RUHOLL; RCECCC; CLARK COUNTY PRESERVATION COMMITTEE; JDL BROADCASTING, INC.; LAURA TE GROTENHUIS; PIATT, DOUGLAS, MOULTRIE, AND CHRISTIAN COUNTY PROPERTY OWNERS; MARK LASH; DEAN L. McWARD; DONALD C. McWARD; SHIRLEY McWARD; EDWARD CORLEY TRUST; and ERIC SPRAGUE, and LAURA SPRAGUE, Respondents.

District & No.    Fourth District
Docket Nos. 4-13-0907, 4-13-0917, 4-14-0218, 4-14-0249 cons.

- 4 -

| | |
|---|---|
| Filed | July 20, 2015 |
| Rehearing denied | August 21, 2015 |

| | |
|---|---|
| Decision Under Review | Petition for review of order of Illinois Commerce Commission, No. 12-0598. |

| | |
|---|---|
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Brian R. Kalb (argued), of Byron Carlson Petri & Kalb, LLC, of Edwardsville, for petitioner Adams County Property Owners and Tenant Farmers. |
| | S. Craig Smith and Drew P. Griffin (argued), both of Asher & Smith, of Paris, for petitioner Edgar County Citizens. |
| | Edward D. McNamara, Jr. (argued), of McNamara & Evans, of Springfield, for petitioner Morgan, Sangamon, and Scott Counties Land Preservation Group. |
| | Timothy J. Rigby (argued), of Hart, Southworth & Witsman, of Springfield, for petitioner Macon County Property Owners. |
| | Kelly Turner, of Office of General Counsel, and James E. Weging, John P. Kelliher, and Matthew L. Harvey (argued), Special Assistant Attorneys General, both of Chicago, and James V. Olivero, of Office of General Counsel, of Springfield, for respondent Illinois Commerce Commission. |
| | Hanna M. Conger, Albert D. Sturtevant (argued), Christopher W. Flynn, Rebecca L. Segal, and Anne M. Zehr, all of Whitt Sturtevant LLP, of Chicago, Shannon K. Rust, Mark A. Whitt, and Andrew J. Campbell, all of Whitt Sturtevant LLP, of Columbus, Ohio, and Edward C. Fitzhenry, Managing Associate General Counsel, of St. Louis, Missouri, for respondent Ameren Transmission Company of Illinois. |
| | Adam T. Margolin, Christopher N. Skey, and Christopher J. Townsend, all of Quarles & Brady LLP, of Chicago, for respondent Nature Conservancy. |

William F. Moran III (argued), of Stratton, Giganti, Stone, Moran & Radkey, of Springfield, for respondent Rural Clark and Edgar County Concerned Citizens.

Edward R. Gower, of Hinshaw & Culbertson, LLP, of Springfield, for respondent Peggy Mills.

Panel         JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Turner and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1     These four consolidated appeals involve requests for direct administrative review of an order of the Illinois Commerce Commission (Commission), which authorized Ameren Transmission Company of Illinois (ATXI) to construct a high voltage transmission line and related facilities across several Illinois counties and designated routes and locations for the new construction. Petitioners–Adams County Property Owners (ACPO); Edgar County Citizens Are Entitled to Due Process (ECCDP); Morgan, Sangamon, and Scott Counties Land Preservation Group (MSSCLPG); and Macon County Property Owners (MCPO)–are four groups of individuals and entities that own property affected by the Commission's order. ACPO, MSSCLPG, and MCPO intervened in the underlying proceedings and, on appeal, challenge specific portions of the route chosen for the transmission line (challenged by ACPO and MSSCLPG) and the location selected for a specific substation (challenged by MCPO). ACPO additionally challenges the expedited procedure under which ATXI's petition was considered. Further, ECCDP appeals, arguing its members were not properly notified that their properties would be affected by the underlying proceedings and, thus, their due process rights were violated. We affirm.

¶ 2                               I. BACKGROUND

¶ 3     The Public Utilities Act (Utilities Act) (220 ILCS 5/8-406 (West 2010)) requires that a public utility obtain a certificate of public convenience and necessity from the Commission before transacting business or beginning new construction within Illinois. Section 8-406 of the Utilities Act sets forth requirements for obtaining a certificate. 220 ILCS 5/8-406 (West 2010). Effective July 28, 2010, the legislature enacted section 8-406.1 of the Utilities Act (220 ILCS 5/8-406.1 (West 2010)), permitting a public utility to apply for a certificate using an expedited procedure when seeking to construct a new high voltage electric service line and related facilities. Under the expedited procedure, the Commission is required to issue a decision granting or denying a request for a certificate "no later than 150 days after the application is filed"; however, within 30 days after filing, the Commission may extend the deadline by an additional 75 days if it "finds that good cause exists to extend the 150-day period." 220 ILCS

5/8-406.1(g) (West 2010). Further, a certificate must be issued where the Commission finds the proposed project will promote the public convenience and necessity and the following criteria are satisfied:

"(1) That the Project is necessary to provide adequate, reliable, and efficient service to the public utility's customers and is the least-cost means of satisfying the service needs of the public utility's customers or that the Project will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives.

(2) That the public utility is capable of efficiently managing and supervising the construction process and has taken sufficient action to ensure adequate and efficient construction and supervision of the construction.

(3) That the public utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8-406.1(f) (West 2010).

¶ 4 On November 7, 2012, ATXI elected to file a petition utilizing the expedited procedure in section 8-406.1. It asked the Commission to issue a certificate of public convenience and necessity that would authorize it "to construct, operate and maintain a new 345 kV electric transmission line *** and related facilities, including certain new or expanded substations, within *** Illinois." ATXI's plan for construction was designated the Illinois Rivers Project (Project) and portions of the Project were to be located within several Illinois counties, spanning 375 miles across the state, from its Missouri to Indiana borders.

¶ 5 Due to the magnitude of the Project, the underlying proceedings were complex and involved multiple parties. The record indicates the Commission sent notices of the proceeding to approximately 8,436 potentially affected landowners. Numerous entities and individuals sought, and were granted, leave to intervene. Commission staff members also participated in the underlying proceedings, presenting arguments and recommendations to the Commission. Several status hearings were held before the Commission's administrative law judges (ALJs) and evidentiary hearings were conducted from March 13 to 17, 2013. Pursuant to statutory requirements, ATXI submitted both a primary and alternative route for its Project, while intervening parties also submitted various routes for consideration.

¶ 6 On August 20, 2013, the Commission issued a 135-page order. To facilitate a resolution of the matter, it evaluated the Project in segments and set forth the parties' arguments, the recommendations of Commission staff, and its own conclusions with respect to each segment. In reaching its decision, the Commission noted that, although virtually all of the involved parties agreed that some form of the Project was necessary, the issue of *where* to construct the transmission lines and related facilities was heavily contested. Ultimately, the Commission found the requirements of section 8-406.1 had been met; approved specific routes for the proposed transmission line, as well as locations for new and expanded substations; and issued a certificate of public convenience and necessity to ATXI with respect to those approved routes and locations. However, the Commission did not grant all of the approvals sought by ATXI and specifically declined to approve routes for the transmission line in two segments and several of the proposed locations for new and expanded substations.

¶ 7 Various parties sought rehearing in the matter, some of which were granted by the Commission. Following further evidentiary hearings, the Commission issued a first order on rehearing on February 5, 2014, and a second order on rehearing on February 20, 2014. Due to

the complexity of the underlying proceedings, we provide a more detailed recitation of the facts and the issues presented as they relate to the specific parties on appeal.

¶ 8                            A. ACPO–Appeal No. 4-13-0907

¶ 9       ACPO is a group of landowners affected by the segment of the Project known as the Quincy-Meredosia segment. ACPO intervened in the underlying proceedings and submitted three alternative routes for the proposed transmission line. Before the Commission, ACPO advocated for a route referred to as its "Alternative Route 1," which largely paralleled an existing 138 kV transmission line that ran through the area. Conversely, ATXI recommended approval of a "Hybrid Route" (also referred to by ATXI as the "Rebuttal Recommended Route") that had been developed by Commission staff by combining elements of the primary and alternative routes ATXI originally submitted to the Commission.

¶ 10       The record reflects ACPO's Alternative Route 1 was the shortest and least costly route to construct. It was 43.6 miles in length compared to the Hybrid Route, which was 46.3 miles long. Additionally, Alternative Route 1 cost $9.1 million less to construct than the Hybrid Route. Commission staff expressed a preference for Alternative Route 1 over the Hybrid Route; however, the Commission ultimately selected the Hybrid Route, finding it presented the "least cost" as compared with Alternative Route 1. It stated as follows:

> "The Commission is persuaded that the Hybrid Route is the best option for this project because it is cost-effective and should eliminate concerns raised by almost all of the intervenors who have submitted testimony regarding this portion of the project. The Commission is also troubled by the evidence that ACPO Alternative Route 1 would require extensive tree removal, as well as the possible displacement of six residences. It appears to the Commission that any cost savings envisioned by the shorter length of ACPO Alternative Route 1 would be eclipsed by the potential displacement of homes."

¶ 11       On September 19, 2013, ACPO filed an application for rehearing, which the Commission denied. ACPO's appeal followed. Not all of ACPO's members join in its appeal. Although ACPO filed a first amended petition for leave to intervene and listed 29 individuals and entities as its members, only 5 of those 29 members now seek review of the Commission's decision.

¶ 12                           B. ECCDP–Appeal No. 4-13-0917

¶ 13       ECCDP is a group of 21 landowners affected by the Kansas-Indiana State Line segment of the Project. With respect to that segment, several individuals or groups with affected property interests were allowed to intervene and five routes were proposed by the parties for consideration by the Commission. Ultimately, in its August 20, 2013, decision, the Commission approved a route proposed by one of the intervening parties, Stop the Power Lines Coalition (Stop Coalition).

¶ 14       ECCDP did not become involved in the underlying proceedings until after the Commission issued its initial decision in the matter. Specifically, on September 18, 2013, ECCDP filed a petition for leave to intervene, asserting its members owned real estate that was directly on, or immediately adjacent to, the alternate route proposed by ATXI. They asserted they would be affected by the transmission line but did not receive notice of the underlying proceedings until they received letters from ATXI, which were dated September 6, 2013, and advised them of the Commission's August 20, 2013, decision.

¶ 15 On September 19, 2013, ECCDP filed a "DUE PROCESS MOTION TO STRIKE PROCEEDINGS AS TO THE EDGAR COUNTY SEGMENT AND APPLICATION FOR REAHEARING." It asserted its members were directly affected by the Commission's August 20, 2013, decision, but they did not receive proper notice of the underlying proceedings. ECCDP alleged the lack of notice denied its members due process and requested that proceedings pertaining to the segment of the Project affecting them be stricken so that they could be afforded the same rights as other property owners who did receive notice. ECCDP attached the affidavit of one of its members to its motion, wherein the member averred he did not receive notice of either the proposed transmission line Project or the underlying proceedings until receiving ATXI's September 6, 2013, letter. On October 1, 2013, ECCDP filed a motion to supplement its motion to strike and application for rehearing with the affidavits of all but three of its remaining members. In each affidavit, a member of ECCDP averred he or she received no notice of the Project or the underlying proceedings until receiving ATXI's September 6, 2013, letter.

¶ 16 On October 2, 2013, the Commission's ALJs denied ECCDP's petition for leave to intervene. They also recommend the Commission deny ECCDP's September 19, 2013, filing. In a memorandum to the Commission, the ALJs stated as follows:

> "Whether each of the 21 property owners making up [ECCDP] own land directly over which the transmission line will run is not clear from the two [ECCDP] filings. Generally, those owning land adjacent to or near a proposed transmission line route would not normally receive notice of such a docket from the Commission. In the instant proceeding, however, several of the [ECCDP] members *** appear on the service list for a January 31, 2013[,] notice informing landowners of this docket and their opportunity to participate. For some unknown reason, these landowners chose not to participate. While they are free to intervene now, they must accept the record as it exists at the time of their intervention (which they acknowledge in paragraph 4 of their September 18, 2013[,] petition to intervene and paragraph 5 of their September 19, 2013[,] filing). At this time, the transmission line route segment from the Kansas substation to the Indiana state line through Edgar County is resolved and in light of the reasons given, [ECCDP] can not reasonably expect the Commission to vacate that part of this proceeding affecting Edgar County and grant rehearing."

On October 3, 2013, the Commission denied ECCDP's motion to strike and application for rehearing.

¶ 17 On October 22, 2013, ECCDP filed a notice of appeal, challenging the Commission's August 20, 2013, order and its denial of ECCDP's request for rehearing. On October 23, 2013, the ALJs granted ECCDP's petition to intervene for the limited purpose of accommodating appellate review.

¶ 18                                    C. MSSCLPG–Appeal No. 4-14-0218

¶ 19 MSSCLPG is a group of over 60 individuals and entities affected by the segment of the Project referred to as the Meredosia-Pawnee segment. Several parties intervened with respect to this segment and various routes were proposed for consideration. ATXI and three intervening parties recommended approval of ATXI's alternate route, which was also referred to in the underlying proceedings as the "Rebuttal Recommended Route" and referred to by the Commission as the "Stipulated Route." One of those three intervening parties, Morgan and

Sangamon County Landowners and Tenant Farmers (MSCLTF), submitted a route referred to as the "MSCLTF Route," which paralleled an existing transmission line. However, MSCLTF ultimately withdrew its support for its proposed route in favor of ATXI's Stipulated Route. In the underlying proceedings, MSSCLPG and one other intervening party advocated for the MSCLTF Route. Commission staff also supported the MSCLTF Route.

¶ 20 The Commission chose ATXI's Stipulated Route as the least-cost route for the Meredosia-Pawnee segment. In so holding, it found "that little evidence in support of the MSCLTF Route ha[d] been presented by any of the parties" and it was "difficult from the evidence presented to fairly judge whether the MSCLTF Route would be superior to Stipulated Route."

¶ 21 On September 18, 2013, MSSCLPG filed an application for rehearing, which the Commission granted on October 2, 2013. In December 2013, further evidentiary hearings were held in the matter. On February 20, 2014, the Commission issued a second order on rehearing and addressed the Meredosia-Pawnee segment of the Project. The record shows ATXI asked the Commission to reapprove its Stipulated Route, while MSSCLPG again sought approval of the MSCLTF Route. Once more, the Commission chose the Stipulated Route.

¶ 22 MSSCLPG's appeal followed.

¶ 23 D. MCPO–Appeal No. 4-14-0249

¶ 24 MCPO is a group of 27 individuals and entities affected by the Pana-Kansas segment of the Project. In connection with that segment, ATXI proposed placing a substation near the Village of Mt. Zion. In its August 20, 2013, decision, the Commission agreed that a new substation in the Mt. Zion area was necessary; however, it declined to approve a particular location for the substation at that time, noting the particular routes for all connecting transmission lines had not yet been determined. ATXI sought and was granted rehearing with respect to this issue, and hearings were conducted before the Commission's ALJs.

¶ 25 On rehearing, Commission staff proposed three locations for the substation at issue. The first two locations–referred to as "Option #1" and "Option #2"–were a few miles south of Mt. Zion and in close proximity to one another. A third location–referred to as "Option #3"–was approximately 17 miles southwest of Mt. Zion and near Moweaqua, Illinois. Both ATXI and an intervening party not at issue on appeal (Moultrie County Property Owners) agreed that Option #1 and Option #2 were acceptable. Further, ATXI entered into a stipulation with the Village of Mt. Zion (also an intervening party in the case) to recommend Option #2. Commission staff expressed a preference for Option #3 and at least one intervening party recommended that route. The record indicates two intervening parties preferred Option #1. Ultimately, the Commission's ALJs entered a proposed second order on rehearing in which they concluded Option #2 was the most appropriate location for the Mt. Zion substation.

¶ 26 On January 29, 2014, MCPO filed a brief addressing its objections to the ALJs' proposed second order. It objected to the selection of Option #2 and argued Option #1 was the preferable choice. On February 20, 2014, the Commission issued its second order on rehearing. It noted the parties' positions, including MCPO's objections to the proposed second order, and selected Option #2 as the site for the Mt. Zion substation. On March 24, 2014, MCPO filed an amended application for rehearing, arguing Option #1 was not given sufficient consideration in the Commission's decision and was preferable to Option #2. The Commission denied MCPO's

application for rehearing and MCPO appeals.

¶ 27                                  II. ANALYSIS
¶ 28                               A. Standard of Review
¶ 29        "[T]he Commission is entitled to great deference because it is an administrative body possessing expertise in the field of public utilities." *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 397, 704 N.E.2d 387, 390 (1998). "We will not reevaluate the credibility or weight of the evidence, nor substitute our judgment for that of the Commission." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 9, 958 N.E.2d 405.

¶ 30        Pursuant to the Utilities Act, the Commission's findings and conclusions on questions of fact should be held *prima facie* true, the Commission's orders must be held *prima facie* reasonable, and an appealing party has the burden of proof upon all issues raised by the appeal. 220 ILCS 5/10-201(d) (West 2010). "Review of a Commission order is limited to the following questions: (1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated." *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476, 644 N.E.2d 817, 821 (1994). "Substantial evidence consists of evidence a reasoning mind would accept as sufficient to support the challenged finding; it is more than a scintilla of evidence but requires something less than a preponderance of the evidence." *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2013 IL App (4th) 121008, ¶ 18, 2 N.E.3d 1087.

¶ 31        On review, the Commission's factual findings "will not be overturned unless they are against the manifest weight of the evidence." *Ameren*, 2013 IL App (4th) 121008, ¶ 19, 2 N.E.3d 1087. "[A]n appellant must do more than merely show that the evidence presented would support a conclusion different from the one reached by the [Commission]; rather, the appellant must affirmatively demonstrate that the conclusion opposite to that reached by the [Commission] is clearly evident." *Northern Moraine Wastewater Reclamation District v. Illinois Commerce Comm'n*, 392 Ill. App. 3d 542, 556, 912 N.E.2d 204, 219 (2009). "If the record contains evidence supporting the agency's decision, it should be affirmed." *Caterpillar, Inc. v. Illinois Commerce Comm'n*, 348 Ill. App. 3d 823, 828, 808 N.E.2d 32, 36 (2004).

¶ 32        "When the Commission's decision presents a question of mixed law and fact, we review the Commission's order under the clearly erroneous standard." *Ameren*, 2013 IL App (4th) 121008, ¶ 19, 2 N.E.3d 1087.

             " 'The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and as such, it grants some deference to the agency's decision.' [Citation.] In that circumstance, the reviewing court must be left with a 'definite and firm conviction' that the Commission committed a mistake." *Ameren*, 2013 IL App (4th) 121008, ¶ 19, 2 N.E.3d 1087 (quoting *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 9, 964 N.E.2d 510).

¶ 33        Finally, "the Commission's interpretation of a question of law is not binding on a court of review" (*Archer-Daniels-Midland*, 184 Ill. 2d at 397, 704 N.E.2d at 390) and such questions

are subject to a *de novo* standard (*People ex rel. Madigan v. Illinois Commerce Comm'n*, 2014 IL 116642, ¶ 8, 21 N.E.3d 418). However, this court has held that "[t]he Commission's interpretation of a statute it is charged with administering and enforcing is entitled to substantial weight and deference." *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2012 IL App (4th) 100962, ¶ 61, 967 N.E.2d 298 (citing *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 46, 779 N.E.2d 875, 881 (2002)). Further, "[a] court may overturn the Commission's interpretation of its own rules if its construction is clearly erroneous, arbitrary, or unreasonable." *Ameren*, 2012 IL App (4th) 100962, ¶ 61, 967 N.E.2d 298.

¶ 34                                    B. ACPO–Appeal No. 4-13-0907

¶ 35      On appeal, ACPO's overriding complaint is that the Commission erred by selecting the Hybrid Route over its proposed Alternative Route 1 in connection with the Quincy-Meredosia segment of the Project. It contends the Commission's factual findings were against the manifest weight of the evidence and makes various challenges regarding the expedited procedure under which ATXI brought its petition.

¶ 36                          1. *Section 8-406.1's Expedited Procedure*

¶ 37      We first address ACPO's claims related to the Utilities Act's expedited procedure. It asserts the Commission acknowledged that it lacked sufficient time to fully analyze ATXI's petition for a certificate of public convenience and necessity and that, due to the expedited process, the record was incomplete. ACPO contends the Commission should have required further investigation into the matter rather than move forward with the petition and issue ATXI a certificate. It further argues "the lack of time, length of the proposed transmission line, and the number of intervenors *** resulted in a violation of property owners' due process."

¶ 38      As stated, section 8-406.1 of the Utilities Act (220 ILCS 5/8-406.1 (West 2010)) permits a public utility to apply for a certificate using an expedited procedure when seeking to construct a new high voltage electric service line and related facilities. Under that section, the Commission must issue a decision granting or denying a request for a certificate "no later than 150 days after the application is filed"; however, within 30 days after filing, the Commission may extend the deadline by an additional 75 days if it "finds that good cause exists to extend the 150-day period." 220 ILCS 5/8-406.1(g) (West 2010).

¶ 39      ACPO correctly points out that the Commission was critical of ATXI's request invoking the expedited procedure set forth in section 8-406.1, particularly given the magnitude of the Project before it. In its August 20, 2013, decision, the Commission included a section entitled "Propriety of the Petition," wherein it questioned ATXI's decision to utilize the expedited process and set forth its concerns regarding the possible emergence of future problems or shortcomings with proposed routes, which were not anticipated or identified under the expedited process. In short, the Commission was "troubled by the very real possibility that the expedited schedule for considering such a massive project may result in less than optimal outcomes." Nevertheless, despite its disapproval, the Commission found it was required "to follow the directives set forth by the general Assembly" and stated it would "make every effort to weigh the evidence that [was] before [it] and make the best decisions possible in light of the record." It then proceeded to address the substantive issues presented by the parties.

¶ 40      To the extent ACPO argues the Commission should have declined to move forward with ATXI's petition given its concerns, we disagree. The Utilities Act gives a public utility

- 12 -

discretion to proceed under its expedited procedure for seeking a certificate and sets forth no limit to that discretion based upon the scope of the utility's proposed project. 220 ILCS 5/8-406.1(a) (West 2010) (stating "[a] public utility may apply for a certificate of public convenience and necessity pursuant to" section 8-406.1). Here, ATXI chose to file its petition under section 8-406.1, and the Commission was required to grant or deny the petition within the stated time frame. The broad concern expressed by the Commission–regarding the potential for less than optimal outcomes from an expedited procedure when a project is complex and significant in scope–is a matter for the legislature to address and not a basis upon which the Commission could deny ATXI's petition.

¶ 41    As the Commission argues, its "general misgivings regarding the propriety of expediting the proceeding under review are not a basis for challenging its specific findings of fact and conclusions of law." We agree and find that, contrary to ACPO's contentions, the Commission's general comments in the "Propriety of the Petition" section of its decision do not warrant a finding that the evidence presented with respect to the *entire* Project was insufficient or incomplete. The Utilities Act sets forth the criteria which must be satisfied by a petitioning utility before a certificate may be granted. 220 ILCS 5/8-406.1(f) (West 2010). Clearly, where the evidence is insufficient or the utility fails to meet its burden, its petition should be denied. In this case, no party on appeal challenges the Commission's finding that the Project at issue was necessary. Further, the record shows there were specific instances where the Commission found the evidence lacking and refused to approve routes and locations for particular parts of the Project. Specifically, in its August 20, 2013, decision, the Commission declined to approve a route for the transmission line between Pawnee and Pana and between Pana and Mt. Zion. It also declined to approve proposed new or expanded substations at six locations.

¶ 42    ACPO cites *Citizens United for Responsible Energy Development, Inc. (CURED) v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82, 673 N.E.2d 1159 (1996), for the proposition that the Commission commits error when it grants a petition for a certificate of public convenience and necessity based upon a record that is incomplete with respect to the issue of least-cost means. In that case, Commission staff inexplicably failed to investigate or consider the issue of least-cost means when addressing a petition filed pursuant to section 8-406 of the Utilities Act (220 ILCS 5/8-406 (West 1994)). *Citizens United*, 285 Ill. App. 3d at 92, 673 N.E.2d at 1166. As a result, the Fifth District found the Commission's determination that the petitioning party's "proposal constituted the least-cost means of satisfying the service needs of *** customers *** lacked sufficient foundation." *Citizens United*, 285 Ill. App. 3d at 92, 673 N.E.2d at 1166. It reversed the Commission's order and remanded with directions that "a *complete* investigation" into least-cost means be conducted. (Emphasis in original.) *Citizens United*, 285 Ill. App. 3d at 93-94, 673 N.E.2d at 1167.

¶ 43    We do not disagree with the holding in *Citizens United* but find that case factually distinguishable from the circumstances presented by this case. Here, neither the Commission nor its staff ignored the issue of least-cost means. Instead, the record reflects issues related to least-cost means were investigated, argued, and considered at length. The holding in *Citizens United* does not warrant reversal of the Commission's decision here.

¶ 44    Finally, as discussed, ACPO argues the expedited procedure set forth in section 8-406.1 violated property owners' due process rights as set forth by the state and federal constitutions.

Specifically, it contends that, given the expedited schedule, its members were unable to meaningfully participate in the underlying proceedings.

¶ 45    Pursuant to the United States and Illinois Constitutions, no person may be deprived of life, liberty, or property without due process of law. U.S. Const., amend. XIV; see also Ill. Const. 1970, art. I, § 2. " 'The core of due process is the right to notice and a meaningful opportunity to be heard'; no person may be deprived of a protected interest by an administrative adjudication of rights unless these safeguards are provided." *World Painting Co. v. Costigan*, 2012 IL App (4th) 110869, ¶ 14, 967 N.E.2d 485 (quoting *Lachance v. Erickson*, 522 U.S. 262, 266 (1998)). Further, in the context of an administrative proceeding, "due process is satisfied when the party concerned has the 'opportunity to be heard in an orderly proceeding which is adapted to the nature and circumstances of the dispute.' " *WISAM 1, Inc. v. Illinois Liquor Control Comm'n*, 2014 IL 116173, ¶ 26, 18 N.E.3d 1 (quoting *Obasi v. Department of Professional Regulation*, 266 Ill. App. 3d 693, 702, 639 N.E.2d 1318, 1325 (1994)). "A fair hearing includes the right to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling on the evidence." *WISAM 1*, 2014 IL 116173, ¶ 26, 18 N.E.3d 1.

¶ 46    "A due process analysis must begin with a determination of whether a protectible interest in life, liberty, or property exists because if one is not present, no process is due." *Callahan v. Sledge*, 2012 IL App (4th) 110819, ¶ 28, 980 N.E.2d 181 (citing *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 12, 963 N.E.2d 918). On review, ACPO generally states its members had property rights at risk in the underlying proceedings but fails to set forth any fully developed argument with respect to that contention. Conversely, the Commission argues the property rights of ACPO's members were not affected by the proceedings at issue and, thus, there was no process to which they were due in the certification proceedings before the Commission. We agree with the Commission and find relevant case law supports its position.

¶ 47    The Commission relies on this court's decision in *Illinois Power Co. v. Lynn*, 50 Ill. App. 3d 77, 365 N.E.2d 264 (1977). While procedurally, *Lynn* is not directly on point, we do find it instructive. In that case, a utility brought an action to acquire certain tracts of land by eminent domain pursuant to authority granted to it by the Commission in a certificate of convenience and necessity and an enabling order. *Lynn*, 50 Ill. App. 3d at 78, 365 N.E.2d at 265. The landowners filed a motion to dismiss and traverse, which the trial court denied. *Lynn*, 50 Ill. App. 3d at 78, 365 N.E.2d at 265. On review, this court identified the question before it as whether the "Commission's finding that the needs and plans of the utility constitute a 'public use,' and that certain properties need be acquired to develop those plans, preempt the courts from inquiring into these same subject matters, where the property owners fully participated as a 'party' before the Commission." *Lynn*, 50 Ill. App. 3d at 78, 365 N.E.2d at 265.

¶ 48    Ultimately, we determined courts were not preempted from inquiring into the same subject matters as the Commission during certification proceedings and found the trial court erred in dismissing the landowners' motion to dismiss and traverse. *Lynn*, 50 Ill. App. 3d at 82, 365 N.E.2d at 268. In so holding, we stated as follows:

"The hearing [before the Commission] was on the reasonableness of the utility's *plans* and could not confer property rights. Appeal of the order of the *** Commission to the courts as provided by statute would only have been a review of the proposed plan for development of the project and the extent of the property to be sought. The appearance of the owners before the *** Commission to give input into the plans, or object thereto,

- 14 -

could not bar them from later exercising their rights as owners of property being taken for a public use. There is nothing in the *** Utilities Act preempting the rights of the property owners in the condemnation proceedings." (Emphasis in original.) *Lynn*, 50 Ill. App. 3d at 81-82, 365 N.E.2d at 267.

¶ 49 Additionally, *Lynn* relied on two supreme court decisions that are relevant to the issue presented here. First, in *Chicago, Burlington & Quincy R.R. Co. v. Cavanagh*, 278 Ill. 609, 614, 116 N.E. 128, 130 (1917), the Public Utilities Commission determined that the public convenience and safety required a relocation of railroad tracks and ordered that the tracks follow a certain course. The defendant property owners complained, in part, that they "were neither notified to be present at the hearing before the commission nor was any certified copy of the order served on them, so that they might appear before the commission and have a hearing on evidence as to the reasonableness of the order." *Cavanagh*, 278 Ill. at 613, 116 N.E. at 130. In rejecting defendants' argument, the supreme court stated as follows:

"The order of the commission did not amount to an appropriation of the defendants' property or any interest in it, which could only be accomplished by the filing of a petition and the ascertainment and payment of compensation for the property, so that there was no violation of the due process provision of the constitution. The defendants were not deprived of their property, nor of any interest therein, by the mere making of the order, which neither gave the petitioner any interest in or right to possession of the property." *Cavanagh*, 278 Ill. at 617, 116 N.E. at 131.

¶ 50 Second, in *Zurn v. City of Chicago*, 389 Ill. 114, 115, 59 N.E.2d 18, 19 (1945), a citizen and taxpayer brought constitutional challenges to an act known as the Neighborhood Redevelopment Corporation Law (Ill. Rev. Stat. 1943, ch. 32, ¶ 550.1 *et seq.*), the purpose of which was to rehabilitate and rebuild urban areas. The act provided for the creation of a Redevelopment Commission which had the authority to approve proposed development plans by issuing certificates of convenience and necessity. *Zurn*, 389 Ill. at 119, 59 N.E.2d at 21. Relevant to this appeal, one challenge to the act was based on the contention that it did not provide property owners with proper notice of applications for a certificate of convenience and necessity. *Zurn*, 389 Ill. at 129, 59 N.E.2d at 25. Rejecting that argument, the supreme court stated as follows:

"It is argued that the failure of the act to provide for actual notice of such hearing to the property owners constitutes a denial of due process of law. It should be kept in mind that this hearing is merely an application for a certificate of convenience and necessity. The act provides only for general notice by publication. It is argued that when the commission issues its certificate of convenience and necessity, this authorizes the corporation to proceed with the project and to acquire the property located within the development area by eminent domain. It is obvious, however, that no property or property interests are to be taken or interfered with on this hearing. It is simply one of the steps prescribed by the act in the chain of events authorizing the redevelopment corporation to proceed with the development and to acquire property by voluntary conveyance and by eminent domain for that purpose.

* * *

*** No property or property rights of the landowners are taken, nor are such rights affected by anything which occurs in the hearing before the commission for a certificate of convenience and necessity. Such property owners are not entitled to

notice of such hearing before the commission. The failure of the act to provide for such notice does not constitute a denial of due process of law." *Zurn*, 389 Ill. at 129-32, 59 N.E.2d at 25-27.

¶ 51        As found in *Lynn*, *Cavanagh*, and *Zurn*, the underlying proceedings before the Commission neither conferred property rights on ATXI nor deprived landowners of their protected property interests. As a result, ACPO's members were not entitled to due process during those proceedings and cannot assert a due process violation. Nevertheless, we note the record belies ACPO's assertions that its members "effectively" received no notice and no meaningful opportunity to participate in the underlying proceedings. In fact, ACPO's members did receive notice of ATXI's petition for a certificate of public convenience and necessity and intervened and fully participated in each step of the proceedings before the Commission. It presented evidence, cross-examined witnesses, submitted posthearing briefs, and advocated for an alternate route proposal, which it continues to assert is the superior routing option. Thus, we find the record shows ACPO did meaningfully participate in the underlying proceedings and its contention that its members' due process rights were violated is without merit.

¶ 52                                *2. Least-Cost Means*

¶ 53        ACPO next contends ATXI failed to demonstrate before the Commission that the Hybrid Route was the "least-cost means" for the Project. It argues the Commission's decision to approve the Hybrid Route was against the manifest weight of the evidence.

¶ 54        For a public utility to obtain a certificate of public convenience and necessity under the Utilities Act, its proposed project must be the "least-cost means" of satisfying its customers' service needs. 220 ILCS 5/8-406.1(f)(1) (West 2010). The Utilities Act does not define "least-cost" or articulate the manner in which "least-cost means" should be determined by the Commission. However, in the context of the proceedings before it, the Commission found that "[r]esolving the question of least-cost involve[d] a comprehensive consideration and balancing of the overall costs and externalities of each proposed route against the benefits of each proposed route." It determined "costs and externalities include[d] not only the financial tally for manpower and equipment, but also the impact on local residents and resources and present and future land uses."

¶ 55        The Commission also noted that in past certification proceedings, it had utilized 12 criteria for purposes of evaluating proposed routes, including (1) length of the line, (2) difficulty and cost of construction, (3) difficulty and cost of operation and maintenance, (4) environmental impacts, (5) impacts on historical resources, (6) social and land use impacts, (7) number of affected landowners and other stakeholders, (8) proximity to homes and other structures, (9) proximity to existing and planned development, (10) community acceptance, (11) visual impact, and (12) presence of existing corridors. It stated its decision would result from balancing the 12 criteria and any other relevant factors presented by the parties. Finally, the Commission stated no factor for consideration was inherently more important than another factor.

¶ 56        On review, ACPO does not challenge the Commission's method for determining least-cost means. Instead, it contends the weight of the evidence favored its proposed Alternative Route 1 over the Hybrid Route. ACPO points out that its Alternative Route 1 cost $9 million less to build and was shorter than the Hybrid Route. Further, it maintains Alternative Route 1 used existing rights-of-way for 50% of the route and satisfied all of the intervenors. Finally, ACPO

challenges the Commission's factual findings as being based on speculation and not supported by the evidence.

¶ 57    Here, we find the record contains evidence to support the Commission's factual findings and we cannot say that an opposite conclusion from that reached by the Commission is clearly evident. In reaching its decision, the Commission first concluded that there did not seem to be much difference between the proposed routes with respect to most of the 12 factors. (We note that, in its decision, the Commission sometimes referred to 11 criteria it considered rather than the 12 criteria for consideration it initially set forth. However, the record reflects this discrepancy is the result of the Commission combining factors 7 and 8, as set forth above, into a single factor.) Ultimately, however, it chose to approve the Hybrid Route favored by ATXI over ACPO's Alternative Route 1. It found the Hybrid Route was cost-effective and would eliminate the concerns of almost all intervening parties.

¶ 58    In finding that the Hybrid Route was the least-cost option, the Commission noted its concern that "Alternat[ive] Route 1 would traverse an existing residential area near Interstate 172, potentially requiring the displacement of at least six assumed residences." It also considered that "Alternat[ive] Route 1 would require approximately 40 additional acres of tree removal." The Commission further addressed ACPO's characterization of its route as being on "a partially acquired unoccupied corridor." It found no advantage in favor of ACPO's route on that basis, noting that 50% of the corridor had not been acquired and existing easements were too narrow to accommodate the transmission line at issue. Finally, the Commission noted ATXI's position that ACPO's proposed route presented reliability, operational, and maintenance concerns because it extensively paralleled an existing transmission line.

¶ 59    On appeal, ACPO claims there is no credible evidence in the record that its proposed route would displace six residences. Before the Commission, ATXI witness Donell Murphy, who assessed the environmental impacts of the Project, testified the Hybrid Route would be located in close proximity to fewer existing residences than ACPO's Alternative Route 1. She asserted Alternative Route 1 had six residences within 75 feet of its centerline, which would require displacement of those residences. As ACPO points out on appeal, Murphy acknowledged on cross-examination that she could not attest to the accuracy of maps which purported to show the location of proposed and existing transmission lines, nor could she verify that buildings which appeared to be residences were actually occupied. However, on cross-examination, Murphy also testified as follows:

> "[W]ith reference to ACPO Route 1 which I believe [ACPO] stated *** would potentially make use of the partially acquired unoccupied corridor and recognizing where that corridor falls, it does traverse existing residences. [The route] goes right over existing residences."

While Murphy could not identify the precise location of the proposed *transmission line* on maps submitted to the Commission, it appears undisputed that ACPO's recommended *route* traversed a residential area and impacted more residences than the Hybrid Route. Given this evidence, we cannot say the Commission's finding regarding the "possible displacement" of residences was against the manifest weight of the evidence.

¶ 60    ACPO also argues the record contains "no evidence of the trees" the Commission found would have to be removed if ACPO's Alternative Route 1 had been selected. It complains that no evidence was introduced regarding the types of trees to be removed or that the removal of 40 acres of trees had any negative cost or environmental impact. Despite ACPO's contention

- 17 -

of "no evidence," the record contains support for the Commission's finding. In particular, it shows Murphy–who the record reflects had "expertise *** in environmental impact assessments"–testified that one reason the Alternative Route 1 did not present "a viable alternative for th[e] project" was that it would "require more than 40 additional acres of tree removal." ACPO points to no evidence refuting Murphy's testimony and we find it sufficient to support both the Commission's factual finding and its determination that such evidence weighed against ACPO's proposed route. An opposite conclusion from that of the Commission is not clearly evident.

¶ 61     ACPO further challenges the Commission's finding that Alternative Route 1's asserted status as a "partially acquired corridor" provided no meaningful advantage over the Hybrid Route. As stated, Alternative Route 1 paralleled an existing transmission line. Before the Commission, ACPO maintained that some of the land needed to construct the new transmission line along ACPO's proposed route had already been acquired by ATXI through easements. It reasoned that constructing the new transmission line along a route where some of the land had been acquired (Alternative Route 1) would cost less and be less burdensome to property owners than constructing the transmission line along a route where none of the land had yet been acquired (Hybrid Route). The Commission rejected ACPO's argument, stating as follows:

> "While ACPO characterizes the western part of its Alternat[ive] Route 1 as a 'partially acquired unoccupied corridor,' the Commission notes that ATXI contends that approximately 50% of that corridor has not been acquired and any existing easements are too narrow to accommodate an additional 345 kV transmission line. Therefore, it does not appear to the Commission that this corridor will offer any meaningful routing advantage over the Hybrid Route."

¶ 62     Again, the Commission's findings are supported by the evidence. Murphy testified that less than 50% of the corridor along Alternative Route 1 had been obtained by easements. Additionally, she stated that ATXI's proposed transmission line required a right-of-way of 150 feet and none of the easements that had been obtained were of that width. Although not referenced by any party on appeal, ATXI witness Jeffrey Hackman, the Director of Transmission Operations for Ameren Services Company, testified that, while overlapping rights-of-way slightly reduced the amount of right-of-way that ATXI would need to purchase for the Project, there were "not any existing rights-of-way with extra width for consideration for th[e] Project." Thus, the evidence indicates that, even if Alternative Route 1 was the approved route for the segment of the Project at issue, ATXI would still need to acquire significant amounts of land to construct its transmission line. We cannot say the Commission's finding that Alternative Route 1 offered no "meaningful routing advantage" over the Hybrid Route was against the manifest weight of the evidence.

¶ 63     Finally, ACPO argues the Commission's finding that the use of parallel transmission lines could present reliability concerns was against the manifest weight of the evidence. ACPO points to testimony from ATXI witness Murphy that, when determining the route for a transmission line, it was advantageous to utilize opportunities where there were existing linear features, such as exiting transmission lines, property lines, and field lines. ACPO also notes a Commission staff electrical engineer, Greg Rockrohr, testified that he had no reliability concerns regarding two parallel transmission lines where they were located on nonoverlapping rights-of-way.

- 18 -

¶ 64    Although ACPO cites evidence to support its position, the record also contains evidence regarding the reliability concerns with parallel transmission lines noted by the Commission. In particular, Hackman testified that with either overlapping or adjoining rights-of-way for transmission lines, "the proximity of the circuits' structures to each other and the likelihood of local weather and wind-blown debris and other objects is *** a concern." He denied that paralleling transmission lines reduced the costs associated with ongoing maintenance and repair, noting both lines might "have to be taken out of service in order to do maintenance." Further, Hackman testified as follows:

> "[I]t is undesirable to construct parallel transmission lines because, unless there is sufficient separation between the lines, during construction of the second line, the first line must be taken out of service. Paralleling is undesirable from an operations perspective for the similar reason that, while maintenance is being performed on one line, the other may need to be taken out of service so that large equipment can access the area. Having two lines down at any given point risks the reliability of the transmission system at large. Moreover, from a reliability perspective, common or adjoining rights-of-way are susceptible to common-mode failures. In other words, it increases the probability that, if one line fails, it will cause the adjacent line to fail. Likewise, weather events, either directly or from debris, can cause both lines to fail. For these reasons paralleling existing transmission lines is generally not preferred."

¶ 65    Finally, Hackman acknowledged that ATXI proposed parallel transmission lines for the Project in "limited circumstances." However, he testified paralleling was not always the best option and "the fact that ATXI has proposed paralleling in appropriate circumstances d[id] not mean than [*sic*] every paralleling opportunity should be used." Hackman asserted that whether to place a proposed transmission line next to an existing one should be based on several factors, including reliability, cost of construction, cost of reinforcements required, impact on the environment, and improvement to system performance. He opined that "[s]ince the Project provide[d] local area reliability benefits," paralleling on the Project "should only be used in very limited circumstances in order to mitigate risks of common-mode failures that could lead to outages for customers." The record further reflects Murphy agreed with Hackman's testimony, agreeing that parallel transmission lines were not the best option when other options were available.

¶ 66    Here, the record contains evidence to support the Commission's finding with respect to parallel line reliability. While the record may be said to contain conflicting evidence on this point, it was the Commission's function to weigh the evidence and reach a determination. An opposite conclusion from that of the Commission is not clearly evident.

¶ 67    As a final matter, ACPO contends the Commission failed to consider the negative impact of the proposed transmission line on ACPO's members. Initially, we note "[t]he Commission need not make a finding on each evidentiary fact or claim." *Central Illinois Public Service*, 268 Ill. App. 3d at 480, 644 N.E.2d at 824. Further, although the record contained evidence to support ACPO's proposed route, simply showing that evidence in the record could support a different conclusion from that reached by the Commission is not a sufficient basis upon which to overturn the Commission's decision. The Commission is entitled to great deference with respect to its factual findings and it is not the function of this court on review to reweigh the evidence. With respect to the Quincy-Meredosia segment of the Project challenged by ACPO on appeal, the record contains sufficient evidence to support the Commission's decision and it

was not against the manifest weight of the evidence.

¶ 68                          C. ECCDP–Appeal No. 4-13-0917

¶ 69     On appeal, ECCDP argues its members' due process rights were violated because they failed to receive notice from the Commission that Stop Coalition, an intervening party in the underlying proceedings, proposed an alternate route for the transmission line which would directly affect the property rights of ECCDP's members. ECCDP also contends that the lack of a clear notice requirement in section 8-406.1 of the Utilities Act renders the statute unconstitutional.

¶ 70                            1. *Procedural Issues*

¶ 71     Initially, we address two procedural issues presented by ECCDP's appeal. First, the record fails to reflect that the denial of ECCDP's request to intervene is properly before this court on review.

¶ 72     On October 2, 2013, the Commission's ALJs denied ECCDP's petition to intervene. See 83 Ill. Adm. Code 200.200(c), amended at 24 Ill. Reg. 16019 (eff. Oct. 15, 2000) ("Petitions to intervene shall be granted or denied by the Hearing Examiner ***."). The Commission's rules contain procedures for seeking review of an ALJ's ruling, which include the filing of a petition for interlocutory review with the Commission within 21 days. 83 Ill. Adm. Code 200.520(a), amended at 35 Ill. Reg. 6327 (eff. Apr. 1, 2011); see also 83 Ill. Adm. Code 200.200(c), amended at 24 Ill. Reg. 16019 (eff. Oct. 15, 2000) (providing that an ALJ's decision regarding intervention is subject to the review procedures set forth in section 200.520 of the Illinois Administrative Code). When reviewing an ALJ's decision, "the Commission may affirm or reverse the ruling in whole or in part, and may take any other just and reasonable action with respect to the ruling, such as declining to act on an interlocutory basis." 83 Ill. Adm. Code 200.520(b), amended at 35 Ill. Reg. 6327 (eff. Apr. 1, 2011). When the Commission's action on an ALJ's ruling involves the denial of a petition to intervene, the aggrieved party may then file a petition to rehear or reconsider the Commission's action. 83 Ill. Adm. Code 200.520(b), amended at 35 Ill. Reg. 6327 (eff. Apr. 1, 2011).

¶ 73     Additionally, pursuant to the Utilities Act, "[n]o appeal shall be allowed from any rule, regulation, order or decision of the Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission." 220 ILCS 5/10-113(a) (West 2010). Finally, an appealing party is not permitted to "urge or rely upon any grounds not set forth in such application for a rehearing before the Commission." 220 ILCS 5/10-113(a) (West 2010).

¶ 74     Here, the procedures set forth in the Commission's rules and the Utilities Act for seeking review of Commission and ALJ decisions were not followed by ECCDP. The record fails to reflect ECCDP ever sought review of the ALJs' decision to deny it leave to intervene or that the Commission ever addressed and resolved that particular issue. Further, in its notice of appeal, seeking administrative review with this court, ECCDP failed to challenge any order related to the denial of its request for intervention. Instead, it identifies the Commission's August 20, 2013, order, and the Commission's denial of its motion to strike and for rehearing as the orders from which its appeal was taken. Thus, the denial of ECCDP's petition to intervene is not properly before this court on administrative review.

¶ 75    Second, the record shows that, while its request to intervene was pending, ECCDP filed a motion to strike and application for rehearing (September 19, 2013) and, later, a motion to supplement its motion to strike and application for rehearing (October 1, 2013). However, only a party to the underlying proceedings was entitled to apply for a rehearing. See 220 ILCS 5/10-113(a) (West 2010) ("Within 30 days after the service of any rule or regulation, order or decision of the Commission *any party* to the action or proceeding may apply for a rehearing in respect to any matter determined in said action or proceeding and specified in the application for rehearing." (Emphasis added.)). At the time ECCDP filed its motion to strike and application for rehearing (as well as its motion to supplement that filing), it was not a party to the proceedings before the Commission as its petition to intervene was pending and had not been granted. In fact, the ALJs ultimately denied ECCDP's petition to intervene and it never became an actual party to the underlying proceedings. As a result, we question whether ECCDP's motion to strike and application for rehearing were ever properly before the Commission.

¶ 76    Nevertheless, we note the Commission's rules provide that "[w]hile a petition for leave to intervene is pending, the [ALJ], in his or her discretion, may permit the petitioner to participate in the proceeding." 83 Ill. Adm. Code 200.200(b), amended at 24 Ill. Reg. 16019 (eff. Oct. 15, 2000). Although our review of the record fails to reflect the ALJs ever expressly permitted ECCDP to participate in the underlying proceedings, they did consider the filings ECCDP submitted while its petition for leave to intervene was pending. Specifically, the record shows the ALJs submitted a memorandum to the Commission and recommended denial of ECCDP's September 19, 2013, filing, *i.e.*, its motion to strike and application for rehearing. On October 3, 2013, the Commission took the recommended action. Given this consideration of ECCDP's filings by the ALJs and Commission, we find it appropriate to address the merits of its appeal.

¶ 77                                    2. *Due Process Claims*

¶ 78    As stated, ECCDP challenges the Commission's decision on the basis that its members' due process rights were violated because of insufficient notice of the underlying proceedings. Specifically, ECCDP complains that its members did not receive notice of an alternate route proposed by an intervening party, which would directly affect land owned by ECCDP's members.

¶ 79    On review, it appears undisputed that ATXI complied with the notice requirements of section 8-406.1, which provide for notice by publication of both the public meetings required under the expedited process and the public utility's application for a certificate. 220 ILCS 5/8-406.1(a)(3), (d) (West 2010). Further, the parties agree that, although not mandated by the Utilities Act, the ALJs required all intervening parties to identify landowners affected by proposed alternate routes for the purpose of giving those landowners notice of the proceedings. ECCDP acknowledges that Stop Coalition complied with the ALJs' requirements; however, they deny that the Commission actually followed through with the process set forth by the ALJs by sending them notice of the proposed alternate route.

¶ 80    Although there is much conflict between the parties on appeal regarding whether notice was actually mailed to ECCDP's members by the Commission, we find it unnecessary to address this specific argument. As already discussed in relation to ACPO's appeal, relevant case authority–*Lynn*, *Cavanagh*, and *Zurn*–demonstrates that the underlying proceedings before the Commission neither conferred property rights on ATXI nor deprived landowners of

- 21 -

their protected property interests. In their reply brief, ECCDP asks this court to "recognize that a proceeding under [s]ection 8-406.1 does implicate landowners' property rights in a significant way." However, they provide no authority upon which we may reject either this court's previous decision in *Lynn* or the supreme court's decisions in *Cavanagh* and *Zurn*. The due process rights of ECCDP's members were not violated.

¶ 81                         D. MSSCLPG–Appeal No. 4-14-0218

¶ 82    On appeal, MSSCLPG argues the Commission erred in approving the Stipulated Route (also referred to as the Rebuttal Recommended Route) supported by ATXI for the Meredosia-Pawnee segment of the Project. It contends the 12 criteria used by the Commission to evaluate least-cost means clearly favored the MSCLTF Route, which MSSCLPG recommended, and the Commission's selection of the Stipulated Route over the MSCLTF Route was against the manifest weight of the evidence.

¶ 83                    1. *Preservation of Issue for Appellate Review*

¶ 84    On appeal, ATXI contends MSSCLPG failed to preserve the issue it raises for appeal because it did not raise this specific contention in its application for rehearing.

¶ 85    As stated, the Utilities Act requires a party to file a petition for rehearing prior to seeking appellate review of the Commission's decision. 220 ILCS 5/10-113(a) (West 2010). An order of the Commission is final and appealable after one rehearing petition filed by a party has been decided. *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 246-47, 817 N.E.2d 479, 485 (2004). However, on review, a party may not "urge or rely upon any grounds not set forth in [an] application for a rehearing before the Commission." 220 ILCS 5/10-113(a) (West 2010).

¶ 86    Here, MSSCLPG filed an application for rehearing following the Commission's August 20, 2013, order. The Commission granted its request, considered additional evidence, and issued a new order. As ATXI claims, MSSCLPG's application for rehearing primarily alleged it had insufficient time to present its claims and the record contained insufficient evidence to reach a route determination with respect to the Meredosia-Pawnee segment of the Project. However, MSSCLPG also asserted the Commission's decision was "contrary to the provisions of [section] 8-406.1" and that the Commission authorized "construction of a route that [was] not the 'least-cost means.' " We find this contention sufficiently similar to the arguments raised by MSSCLPG on review and choose to address the merits of its appeal.

¶ 87                          2. *Weight of the Evidence*

¶ 88    As discussed, MSSCLPG argues the manifest weight of the evidence favors the route it desires over the route ultimately selected by the Commission. Although we recognize the record contained evidence supporting the route MSSCLPG recommends, we cannot say the Commission erred in selecting a different route. In particular, the record reflects the Commission relied on appropriate considerations and its factual findings were supported by the evidence.

¶ 89    Before the Commission can grant a certificate of public convenience and necessity pursuant to section 8-406.1, certain criteria must be satisfied. In particular, the Commission must find "[t]hat the Project is necessary to provide adequate, reliable, and efficient service to

the public utility's customers *and* is the least-cost means of satisfying the service needs of the public utility's customers." (Emphasis added.) 220 ILCS 5/8-406.1(f)(1) (West 2010).

¶ 90    In its second order on rehearing, the Commission chose the Stipulated Route, stating as follows:

"As the criteria are weighed, it is clear to the Commission that the deciding factor for this segment is balancing the cost of each route against potential operational reliability. The Commission is presented with one route [(the MSCLTF Route)] which is clearly shorter, cheaper, and involves fewer landowners, but possibly presents operational issues should a massive storm hit the area where the parallel lines would exist. The Commission also has a choice of a longer, more expensive route [(the Stipulated Route)], which involves more landowners, but avoids the chance of a large storm taking out two nearby transmission lines. In the Commission's view, providing utility service at least cost is important. Even more important is providing safe and reliable service to utility customers. While the Commission does not make this choice lightly, it appears that the more reasonable choice, and the one supported by the law and the evidence, is to approve the Stipulated Route supported by ATXI. The Commission finds the testimony of ATXI witness Hackman to be particularly convincing regarding potential operational difficulties associated with the MSCLTF Route. The Commission finds that avoiding the extensive paralleling associated with the MSCLTF Route is in the best interests of customers and worth the incremental costs associated with the Stipulated Route."

¶ 91    The Commission's comments show it followed the requirements set forth in section 8-406.1 and considered and balanced reliability concerns posed by the recommended routes, as well as issues related to least-cost means. Further, we note that issues related to least cost do not necessarily exclude reliability considerations. Hackman testified that one factor which should be considered when determining "least cost" is the "cost to customers of reliability differences that are offered by route selection." Common sense suggests less reliable transmission lines will likely involve increased costs associated with maintenance and repair. The Commission's considerations in this instance were appropriate.

¶ 92    Additionally, in reaching its decision, the Commission relied on Hackman's testimony, which supports its reliability concerns. On rehearing, Hackman testified regarding ATXI's reasons for not supporting the MSCLTF Route, which paralleled an existing transmission line. In part, he testified as follows:

"It is important to appreciate that when ATXI constructs parallel transmission lines, it gives up reliability, operations, and maintenance benefits, *** and it takes on reliability risks. Putting transmission lines in close proximity is like putting all of your eggs in one basket. It is easier for both lines to go out, or to be taken out, when they are close together. And even in the most compelling case, paralleling routes now may result in the need for an additional circuit in the future that would not otherwise be needed. Therefore, reliability, operations, maintenance, and even security considerations weigh against paralleling transmission lines when possible. And it is possible to avoid paralleling lines for the Meredosia-Pawnee portion of the Project."

¶ 93    On review, MSSCLPG complains that the Commission relied on Hackman's testimony while disregarding conflicting evidence. We disagree that the Commission disregarded any evidence. To the contrary, the record indicates the Commission carefully weighed and

considered the evidence presented. Although the record contains evidence that conflicted with Hackman's testimony, it was the Commission's responsibility to weigh the evidence and determine witness credibility. In this instance, the Commission found "Hackman to be particularly convincing" and the record reflects no error in that determination.

¶ 94 Here, the Commission's decision as to the Meredosia-Pawnee segment of the Project was supported by the record. An opposite conclusion from that of the Commission is not clearly evident and its decision was not against the manifest weight of the evidence.

¶ 95 E. MCPO–Appeal No. 4-14-0249

¶ 96 On appeal, MCPO argues the Commission erred in choosing the location of the Mt. Zion substation. Specifically, it contends the Commission neglected to consider the issue of least-cost means when choosing Option #2 over Option #1.

¶ 97 First, to the extent MCPO claims that the Commission generally failed to consider the issue of least-cost means, we disagree. Here, the record reflects the issue of least-cost means was investigated and considered at length in the underlying proceedings. Although the Commission may not have expressly set forth findings with respect to whether Option #2 was the "least-cost means" when compared with Option #1, the lack of express findings does not mean the Commission failed to consider appropriate factors. *Central Illinois Public Service*, 268 Ill. App. 3d at 480, 644 N.E.2d at 824 ("The Commission need not make a finding on each evidentiary fact or claim."). Further, the record indicates the main source of contention between the parties on rehearing was whether Option #2 or Option #3 was the more appropriate location. Thus, it stands to reason that the Commission would primarily address those options in its decision.

¶ 98 MCPO cites *Citizens United*, arguing the Commission commits error when it fails to consider the issue of least cost. Although we do not disagree with this general proposition, as discussed earlier in connection with ACPO's appeal, *Citizens United* is factually distinguishable from the present case. Specifically, in *Citizens United*, 285 Ill. App. 3d at 92, 673 N.E.2d at 1166, Commission staff inexplicably failed to investigate or consider the issue of least-cost means. The same cannot be said of Commission staff in the case at bar. As a result, *Citizens United* does not warrant reversal of the Commission's decision.

¶ 99 Second, we find MCPO has forfeited any specific challenge to the Commission's finding that Option #2 was the appropriate location for the Mt. Zion substation. Pursuant to Illinois Supreme Court rules, an appellant's brief must contain a statement of facts with "facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013). It must also contain an argument section with "the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). The failure to comply with relevant supreme court rules results in forfeiture of an argument on appeal. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 11, 964 N.E.2d 1139.

¶ 100 Here, MCPO argues Option #1 was preferable to Option #2 and the Commission's selection of Option #2 is not supported by the record. However, it provides no citations to evidence in the record that would support its claims. MCPO's statement of facts contains only two citations to the record–one to the Commission's decision on rehearing and a second to a map submitted in the underlying proceedings–and the argument section of its brief contains no

citation to the record at all. Given that this was a complex case that involved multiple parties and a record consisting of thousands of pages, MCPO's failure to properly cite to the record to support its claims leaves us unable to properly address their merits. On appeal, MCPO has forfeited the argument that the record failed to support the Commission's decision to choose Option #2 as the location for the Mt. Zion substation.

¶ 101                                    III. CONCLUSION

¶ 102          For the reasons stated, we affirm the Commission's judgment.

¶ 103          Affirmed.